In re the Termination of Parental Rights to
Daniel R.S., a Person Under the Age of 18:

Brown County,
Petitioner-Respondent,

v.

Shannon R., Respondent-Appellant-Petitioner.

In re the Termination of Parental Rights to
Darell S.S., a Person Under the Age of 18:

Brown County,
Petitioner-Respondent,

v.

Shannon R., Respondent-Appellant-Petitioner.

Supreme Court

*Nos. 2004AP1305, 2004AP1306. Oral argument
September 8, 2005.—Decided November 30, 2005.*

2005 WI 160

(Also reported in 706 N.W.2d 269.)

For the respondent-appellant-petitioner there were briefs and oral argument by *Brian C. Findley,* assistant state public defender.

For the petitioner-respondent there was a brief and oral argument by *Christopher C. Paquet,* assistant corporation counsel.

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. This is a review of an unpublished decision of the court of appeals[1] affirming the order of the circuit court for Brown County, J.D. McKay, Judge, terminating the

---

[1] *Brown County v. Shannon R.,* Nos. 2004AP1305 & 2004AP1306, unpublished slip op. (Wis. Ct. App. Nov. 3, 2004).

parental rights of petitioner Shannon R., the mother. The court of appeals affirmed the order of termination. We reverse the decision of the court of appeals.

¶ 2. Several issues were presented to this court. Shannon R. contends that the circuit court lost competency to hear the termination by failing to meet the time limits imposed by Wis. Stat. § 48.422.[2]

¶ 3. Shannon R. also argues that the instructions presented to the jury relating to state law elements for termination of parental rights overlapped elements under the Indian Child Welfare Act and that the circuit court improperly instructed the jury that the state law elements must be proven only by clear and convincing evidence. We will discuss these arguments because they may arise on retrial.[3]

¶ 4. The issue upon which we decide this case is as follows: Did the circuit court err by excluding opinion testimony of Shannon R.'s expert witness regarding the substantial likelihood that Shannon R. is able to meet the conditions established for the safe return of her children to the home within the 12–month period following the fact-finding hearing under Wis. Stat. § 48.424? If the circuit court erred in excluding the testimony, we must determine whether the error was reversible error.

¶ 5. We conclude that the constitutional guarantee of due process (fundamental fairness) requires the conclusion that by excluding Shannon R.'s only expert

---

[2] All references to the Wisconsin Statutes are to the 2003–2004 version unless otherwise indicated.

[3] Shannon R. further contends that the evidence presented by Brown County was insufficient to sustain a jury finding, beyond a reasonable doubt, that returning custody of the children to her is likely to result in their serious emotional or physical damage. We do not address this issue.

opinion · testimony, which was clearly central to her defense against termination of parental rights, the circuit court committed reversible error.[4] Accordingly, we reverse the decision of the court of appeals and remand the cause to the circuit court for further proceedings not inconsistent with this opinion.

¶ 6. In so holding, we give full effect to the important legislative policy considerations embodied in the Children's Code. The legislature directs that the best interest of the child remains of paramount concern when deciding cases under the Children's Code. The Children's Code also recognizes the importance of preserving family unity and of assuring fair hearings and the protection of the constitutional rights of all parties involved.[5]

---

[4] The phrase "due process" expresses a requirement of "fundamental fairness." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 24 (1981).

[5] Section 48.01 states the legislative purpose of the Children's Code as follows:

(1) . . . In construing [the Children's Code], the best interests of the child or unborn child shall always be of paramount consideration. This chapter shall be liberally construed to effectuate the following express legislative purposes:

(a) While recognizing that the paramount goal of this chapter is to protect children and unborn children, to preserve the unity of the family, whenever appropriate, by strengthening family life through assisting parents and the expectant mothers of unborn children, whenever appropriate, in fulfilling their responsibilities as parents or expectant mothers. . . . The courts and agencies responsible for child welfare should also recognize that instability and impermanence in family relationships are contrary to the welfare of children and should therefore recognize the importance of eliminating the need for children to wait unreasonable periods of time for their parents to correct the conditions that prevent their safe return to the family.

(ad) To provide judicial and other procedures through which children and all other interested parties are assured fair hearings

285

¶ 7. The legislature has recognized that when reunification of the family is not possible, parental rights should be terminated at the earliest feasible time. If court proceedings are viewed through the eyes of a child, several weeks or months of delay (which may seem a short time to an adult) are extraordinarily long for children. Depriving a child of a permanent home deprives the child of his or her childhood.[6]

¶ 8. Considering the legislative policy in the Children's Code, we are reluctant to delay the permanent placement of the boys in the present case. Nevertheless, we must take into account not only the children's interest in the earliest feasible permanent placement but also Shannon R.'s constitutional rights and the possibility that permanent placement with Shannon R. may, indeed, be in the children's best interests.

and their constitutional and other legal rights are recognized and enforced, while protecting the public safety.

[6] For a discussion of the importance of a child-centered view of time in the legal context, see National Council of Juvenile and Family Court Judges, *Adoption and Permanency Guidelines: Improving Court Practice in Child Abuse and Neglect Cases* 5, 26–27, 34–35 (2000).

The United States Congress has also expressed its preference for quick and safe adoption of children by enacting the Adoption and Safe Families Act of 1997 (ASFA), Pub. L. No. 105–89, 111 Stat. 2115. For discussions of ASFA, see Thomas J. Walsh, *The Clock Is Ticking: Do the Time Limits in Wisconsin's Termination of Parental Rights Cases Serve the Best Interests of Children?,* 83 Marq. L. Rev. 743 (2000); Madelyn Freundlich, *Expediting Termination of Parental Rights: Solving a Problem or Sowing the Seeds of a New Predicament?,* 28 Cap. U.L. Rev. 97 (1999); Stephanie Jill Gendell, *In Search of Permanency: A Reflection on the First 3 Years of the Adoption and Safe Families Act Implementation,* 39 Fam. Ct. Rev. 25 (2001).

## I

¶ 9. The undisputed facts are as follows. Shannon R. is the mother of two sons: Darell S.S., born June 24, 2001, and Daniel R.S., born May 26, 2002. Darell was removed from Shannon R.'s care on July 17, 2001. Daniel was removed immediately upon birth. The father of both children is a member of the Bad River Band of the Lake Superior Tribe of Chippewa Indians. Both children are eligible for enrollment in the Bad River Band. The father has voluntarily terminated his parental rights.

¶ 10. Each child was removed from the mother under a child in need of protection or services (CHIPS) order. The reasons for removal under the CHIPS order are not before this court.[7] The conditions for return of the children in the CHIPS order are, however, important for the present case. The most significant conditions, based on the evidence presented at the fact-finding hearing in the termination proceeding, are that Shannon R. "obtain and maintain suitable housing for a minimum period of three months[,]" including keeping the environment in a condition safe and sanitary for a child; "obtain suitable employment for a 3–month period of time[;]" meet regularly with the Brown County Human Services Department; and cooperate with her probation agent.[8]

---

[7] The record in this case reveals the following basis for the CHIPS petition. On July 10, 2001, Tianna R., one of Shannon R.'s older children, was found dead in her bedroom from dehydration and hyperthermia. The room temperature where Tianna was found was 98 degrees and the temperature on the thermostat was turned up. Further, the only contact Shannon R. and Darell S. (Tianna's father) had with Tianna for 17 hours prior to her death was to observe her from her bedroom door.

[8] Shannon R. was also required to "participate in individual counseling" to deal with childhood issues and issues created by

287

¶ 11. Brown County's petition for termination of parental rights alleged, as the ground for termination under Wis. Stat. § 48.415(2)(a)3., that the children had been outside the home for a cumulative total period of six months or longer pursuant to a CHIPS order, that Shannon R. failed to meet the conditions established for the safe return of the children to the home, and that there is a substantial likelihood that she *will not meet* these conditions within the 12–month period following the fact-finding hearing.[9] The last element, that is, that Shannon R. *will not meet* these conditions, is at issue here.

¶ 12. In regard to this last element, the circuit court asked the jury to answer special verdict question 4, namely: "Is there a substantial likelihood that Shannon R[.] *will not* meet these conditions within the twelve-month period following the conclusion of this hearing?" (Emphasis added.) The circuit court in-

---

past relationships; participate in a psychological evaluation to determine her personality characteristics, her diagnosis, and different modes of treatment; participate in budget counseling and demonstrate her ability to provide for her own and her children's needs; comply with her schedule for visitation with the children; participate in a "wraparound" program to help keep the children in the home once returned; and have no further law violations.

[9] Section 48.415(2)(a)3. sets forth the ground for termination of parental rights at issue in the present case as follows:

That the child has been outside the home for a cumulative total period of 6 months or longer pursuant to such orders not including time spent outside the home as an unborn child; and that the parent has failed to meet the conditions established for the safe return of the child to the home and there is a substantial likelihood that the parent will not meet these conditions within the 12–month period following the fact-finding hearing under s. 48.424.

structed the jury that Brown County had the burden of convincing the jury to a reasonable certainty by evidence that is clear, satisfactory, and convincing that the answer to that question should be yes.

¶ 13. The jury was instructed (in accordance with pattern instruction Wis JI-Children 324) on special verdict question 4 as follows:

Brown County Human Services Department must prove the following four elements to a reasonable certainty by evidence that is clear, satisfactory, and convincing. ... Fourth: That there is a substantial likelihood that Shannon R[.] *will not* meet the conditions for the safe return of Darell and Daniel [] within the twelve-month period following the conclusion of this hearing. Substantial likelihood means that there is a real and significant probability rather than a mere possibility that Shannon R[.] *will not* meet the conditions for the safe return within that time period. Question four of the special verdict addresses this element.

In answering question four, you may consider all evidence bearing on that question, including evidence of events and conduct occurring since the filing of the respective petitions. Your answer must be [sic] reflect your findings as of today's date in each instance.

In determining whether Shannon R[.] failed to meet the conditions established for the safe return of Darell and Daniel to the home or whether there is a substantial likelihood that Shannon R[.] *will not* meet the conditions for the safe return of Darell and Daniel within the twelve-month period following the conclusion of this hearing, you may consider the following:

The length of time Darell and Daniel have been in placement outside the home; the number of times Darell and Daniel have been removed from the home;

289

the parent's performance in meeting the conditions for return of the children; the parent's cooperation with the social service agency; parental conduct during periods in which Darell and Daniel had contact with Shannon R[.]; and all other evidence presented during this hearing which assists in making those determinations. (Emphasis added.)

¶ 14. Apparently to assist the jury in answering special verdict question 4, Brown County presented two expert witnesses. Each witness testified that, in his or her opinion, Shannon R. *is not able* to meet the conditions for return within a 12–month period after the hearing. The testimony that Shannon R. *is not able* to meet the conditions for return of the children within the time period was apparently proffered to assist the jury in determining whether, as required by the statutes, she *will not* meet the conditions in the statutory time period.[10]

¶ 15. The circuit court precluded, however, Shannon R.'s expert, Dr. Gerald G. Wellens, from testifying about his opinion whether Shannon R. *is able* to meet the conditions for return of the children.

¶ 16. The confusion of the concepts *"is able to meet"* and *"will meet"* permeates the circuit court's exclusion of Shannon R.'s expert witness's opinion testimony, as is evident from the testimony of Brown County's experts, the objection to Dr. Wellens's expert opinion testimony, and the circuit court's explanation of the ruling excluding Dr. Wellens's testimony.[11]

---

[10] No Brown County witness was asked to testify whether, in his or her opinion, Shannon R. *will or will not* meet the conditions for return within 12 months.

[11] The court of appeals also confused these two concepts in reviewing the circuit court's exclusion of Dr. Wellens's expert opinion. It declared that the circuit court "only precluded [Dr.

290

¶ 17. Brown County's first expert witness was Tribal Judge Alton Smart of the Bad River Band of Ojibway Indians. On direct examination, Brown County asked Tribal Judge Smart, without any objection, for his opinion about the substantial likelihood that Shannon R. would be able to complete the conditions for return within one year of the hearing. He testified that, on the basis of her past behavior, he did not think there would be any significant behavioral change within one year's time. The exchange went like this:

> Q: [I]s your opinion to the substantial likelihood that . . . Miss R[.] would be able to complete her conditions [for return] within one year of today's date?
>
> A: . . . [T]he best indicator of change is past behavior. Has she demonstrated significant amount of change, that she was making progress or making specific changes, and I was unable to see that happening there. . . . It is my opinion that I hadn't seen enough change there that would warrant that there was going to be significant change in the future, within a year's time.

¶ 18. Judge Smart was qualified by the circuit court as an expert witness. His primary employment, at the time of his testimony, was as a professor of social

Wellens] from opining on the likelihood of Shannon's compliance, not her ability to comply." Contrary to this pronouncement of the court of appeals, the circuit court did not preclude Dr. Wellens from opining on the likelihood of Shannon R.'s compliance because Dr. Wellens was never asked his opinion about whether Shannon R. will comply with the conditions for return of the children. Furthermore, contrary to the court of appeals' conclusion, the circuit court did preclude Dr. Wellens from opining on whether Shannon R. *is able* to comply with the conditions of return. *See Brown County v. Shannon R.*, Nos. 2004AP1305 & 2004AP1306, unpublished slip op., ¶ 37 (Wis. Ct. App. Nov. 3, 2004).

work at the University of Wisconsin—Stevens Point. He holds a master's degree in social work, has conducted some post-graduate study in family therapy and family studies, and has received training from the National Judicial Tribal Judge Association and various other judicial training programs. He never interviewed nor observed Shannon R. or the children.

¶ 19. Brown County's second expert was one of Shannon R.'s social workers, Kay Reynolds, who testified that in her opinion, there was not a substantial likelihood that Shannon R. would be able to meet the conditions for return of the children within 12 months of the fact-finding hearing. Her opinion reflected her view that the past was the best predictor of future behavior.

¶ 20. On direct examination, Ms. Reynolds gave her opinion, without any objection, as follows:

Q: In your opinion, if given a year from today to complete the conditions [for return], would she be able to satisfy these conditions?

A: No, I don't believe she would be able to.

Q: Specifically, what leads you to that conclusion?

A: Shannon has had a working relationship with us for the past two-and-a-half years. And it's my opinion that if after that length of time, when she has been given the amount of support from our agency and from the service providers that have been working with her, if she's still not been able to be successful to show some stability in her lifestyle and, most importantly, to provide . . . for her own needs . . . I feel strongly that it is not going to happen.

Q: But she has completed some of the conditions, correct?

A: The [Alcohol and Other Drug Abuse] condition that was set for her is a condition that wasn't applicable. The parenting program, yes, Shannon did complete the Ruth Helf Family Center program. But the second part of her condition states that she needs to demonstrate a desire and an ability to parent her kids, and . . . I don't believe that missing a significant amount of visits, I don't believe that continuing to be unemployed, to have some dishonesty with myself and with Melissa Blom, to continue to be without her own housing are examples of her showing some stability in her lifestyle that she would be able to . . . be successful with the court order.

Q: What about her activities over the past few months, does that change your opinion?

A: That hasn't changed my opinion, no.

¶ 21. Ms. Reynolds's qualifications included her employment as a child protection social worker for the Brown County Human Services Department for six and one-half years. She has a license to practice social work, which requires 30 hours of continued training biannually. Ms. Reynolds worked with Shannon R. for two and one-half years.

¶ 22. To rebut Brown County's expert opinion evidence about the substantial likelihood of Shannon R. being able to meet the conditions for return of the children to the home within the 12–month period, Shannon R. testified and presented one expert witness.

¶ 23. In her testimony, Shannon R. admitted that she had made mistakes in the past but asserted that she loved her children and that she is able to meet the conditions in the future. Shannon R. testified as follows:

Q: Ms. R[.], I just have one question for you this morning. You've listened to all of the testimony, and I'm

asking you now, what assurances do you have or why do you think that you can complete your conditions within the next twelve months?

A: I've made mistakes in the past two-and-a-half years. I've paid for the mistakes I've made. In March of this year I was told from the department that they were going to file a petition to terminate my rights and that there was nothing that I could do to get my kids back. I didn't listen to them. I got a job, I got my apartment, I started doing my counseling even though they told me I still didn't have a chance, but I wanted to prove to them that I could do my conditions to get my kids back. And then I made another mistake and cut off my [electronic monitoring] bracelet.

I love my kids, and they're everything to me. And I know if I'm given one more opportunity, I can prove that I can complete the conditions they want me to do to get my kids back. I don't know how I'd be able to live my life without them.

¶ 24. The disposition of this matter does not depend on whether Shannon R. loves her children. We have no doubt that she does. Nor do we doubt that her children love her.[12]

¶ 25. Shannon R.'s expert witness, Dr. Wellens, attempted to testify regarding his opinion about the likelihood that Shannon R. *is able* to meet the conditions for return of her children within the applicable time period.

---

[12] Dr. Wellens testified that both boys were very affectionate with their mother, as was she toward them, and that Darell was strongly bonded with her. Another witness testified that Shannon R. successfully completed a six-month parenting class, and Dr. Wellens testified that during a supervised visit in January 2004, Shannon R. was able to direct the boys' behavior, take them to the toilet without incident, and properly discipline Darell when he acted aggressively toward Daniel.

¶ 26. Twice Shannon R.'s attorney asked Dr. Wellens substantially the same question Brown County's attorney asked Tribal Judge Smart and Ms. Reynolds; namely, whether in his opinion there is a substantial likelihood that Shannon R. *is able* to meet the conditions for return within 12 months. Each time, upon objection by the children's guardian ad litem (and over the protestations of Shannon R.'s attorney), the circuit court barred Dr. Wellens from answering the question on the ground that Shannon R.'s counsel failed to lay a proper foundation of expertise for Dr. Wellens to answer the question.

¶ 27. The circuit court was presented with the following foundation regarding Dr. Wellens's qualifications. Dr. Wellens holds a Ph.D. in clinical psychology and two master's degrees, one in counseling psychology and the other in public administration. In Dr. Wellens's private practice, he has extensive experience counseling both adults and children. He conducts approximately two psychological evaluations each week. He regularly conducts psychological evaluations for commitment and competency proceedings on behalf of Brown County and Marinette County.

¶ 28. Dr. Wellens met with Shannon R. for about two hours, reviewed her case history and records, and gave her a battery of psychological tests to help determine her psychological status and whether she is able to meet the conditions for return. He testified that "the purpose of the psychological testing, along with training and experience of a psychologist, [is] to make some predictions of future conduct."

¶ 29. The circuit court ruled that "Dr. Wellens is an expert for purposes of these proceedings in psychology." Nevertheless, the circuit court ruled that Dr. Wellens was not qualified to answer the same question

asked of the two Brown County expert witnesses. According to the circuit court, Dr. Wellens was qualified to testify only about whether, in his professional opinion, no psychological impediment existed to prevent Shannon R. from completing all the conditions for return of her children, including her ability to get stable employment and housing.

¶ 30. The pertinent parts of the lengthy exchange among counsel and the circuit court, as Shannon R.'s counsel repeatedly attempted to lay a foundation for her questions and the circuit court repeatedly sustained objections to the question, are as follows:

> MS. SCHMIEDER [attorney for Shannon R.]: Understanding what Shannon's conditions are at this time, do you believe there exists a likelihood that she will be able to complete those that have not yet been completed within the next twelve months?
>
> MS. PLEGER [guardian ad litem for the children]: Objection, Your Honor. I think this is outside of his expertise. I don't think there's foundation been laid regarding the court-ordered conditions in the dispositional order.
>
> . . . .
>
> THE COURT: Based on his training he can have an opinion, but it can't be as an expert on those conditions . . . . Lay a foundation that he has an understanding of those conditions and we'll go from there.

¶ 31. Shannon R.'s attorney proceeded to ask Dr. Wellens a series of questions establishing that he had reviewed Shannon R.'s case history and was familiar with the conditions in the CHIPS order. The exchange and the circuit court's explanation of the ruling continued as follows:

MS. SCHMIEDER: Based upon your years of experience as a psychologist, based upon your review of the three volumes of materials, based upon your interview with my client, and based upon the four psychological instruments that you have utilized to test her, are you able to a reasonable degree of psychological certainty to reach an opinion as to the likelihood of her ability to complete these conditions as they now stand within the next twelve months?

MS. PLEGER: I have to renew that same objection, Your Honor. I don't think adequate foundation has been laid. I think it's clear that Dr. Wellens can testify and has presented himself as an expert as to whether or not Ms. R[.] has an Axis I or Axis II diagnosis, but I don't think there's been ample foundation laid other than the fact that he read a lot of material that would support his expertise in the area of these conditions as outlined in the dispositional order.

MS. SCHMIEDER: Your Honor, I'm not saying he's an expert on the conditions. But what I am trying to elicit . . . is whether after testing my client he has reached a decision about can she do this in the future.

. . . .

THE COURT: . . . The doctor is in a position to make and offer opinions regarding his expertise and the relationship of his expertise to what he's tested and interviewed and discussed with Ms. R[.], but . . . you've asked the question . . . in such a way that I can't allow him to answer it in the format that it's been asked.

. . . .

MS. SCHMIEDER: With regards to the testing that you've done and the condition to evaluate her personality characteristics, did you find any personality characteristics that will present a bar to her completing the conditions in the next twelve months?

297

MS. PLEGER: Same objection, Your Honor. I don't think sufficient foundation has been laid to determine if . . . the results of her psychological evaluation can . . . present a bar to some of those other conditions that clearly fall outside the scope of . . . psychiatry.

THE COURT: Sustained. . . . I'm going to allow you to ask questions . . . as to whether or not the . . . testing [Dr. Wellens] undertook and the conclusions that he's reached . . . regarding her personality and psychological traits will be a bar to anything. . . . But you keep making a hurdle to whether that prevents her from doing the conditions within the next twelve months, and he can't answer that. He can't make that leap. He can tell you whether his test results and his evaluation present any bars to her, but he can't conclude that . . . she *will* finish those conditions in twelve months . . . because that opinion is not part—or, the basis for that opinion is not part of what he's done.

MS. SCHMIEDER: . . . Dr. Wellens has looked at all the same information that Kay [Reynolds] and [social worker] Melissa [Blom] have had at their disposal, and they were allowed to reach a predictive opinion as social workers about whether or not my client *can* complete something in the future. Dr. Wellens after conducting psychological tests and looking at all the same stuff they've looked at should be able to render the same type of predictive opinion. They didn't say she would or wouldn't. They said we don't think she will. He ought to be able to say, I think she will. And I—

THE COURT: Don't you see the difference, Ms. Schmieder?

MS. SCHMIEDER: No, Your Honor, I don't.

THE COURT: Well, I'm sorry, but the difference is that the basis for his testing is that he can assess whether she has the capability for [meeting the conditions for return]. There is no foundation that he has any understanding or expertise in whether she can

298

actually do it. The social workers, on the other hand, have worked with her in the field on those very subjects, and that's why they're entitled to make that opinion.

He can express an opinion . . . but it has to be on whether or not his expertise and the results of the test that he performed in any way bar her from doing it. . . . [H]e has every right to testify as to whether or not his testing has evidenced any bars or prohibitions to her completing the conditions.

. . . Quite honestly, there is a substantial difference, I believe, between asking whether or not she can complete the condition as opposed to asking whether or not he sees any bar based on his expertise to her completing the condition. I see that as a substantially different consideration. (Emphasis added.)

¶ 32. Shannon R.'s counsel insisted that she had laid the proper foundation for the question about the substantial likelihood that Shannon R. *is able* to meet the conditions within the 12–month period, and that Dr. Wellens was as qualified to give his opinion on this question as Tribal Judge Smart and Ms. Reynolds were to give their opinions.

¶ 33. We turn now to the legal analysis of the correctness of the circuit court's evidentiary ruling excluding Dr. Wellens's expert opinion testimony.

## II

¶ 34. The first issue presented is whether the circuit court erred in barring Dr. Wellens from giving his expert opinion regarding the substantial likelihood that Shannon R. *is able* to meet the conditions established for the safe return of the children to the home within the 12–month period following the fact-finding hearing under Wis. Stat. § 48.424. We begin our discussion by examining the applicable rules of evidence.

¶ 35. Admissibility of expert testimony is governed by Wis. Stat. § 907.02, which permits expert testimony if the witness possesses specialized knowledge relevant to a specific question and the testimony will assist the trier of fact in understanding the evidence or determining a fact in issue.[13] Section 907.02 on expert witnesses " 'continues the tradition of liberally admitting expert testimony' in Wisconsin."[14]

¶ 36. An expert witness is qualified if "he or she has superior knowledge in the area in which the precise question lies."[15] An expert witness, though qualified to testify, may not be qualified to testify with regard to a particular question.[16]

¶ 37. Admissibility of expert testimony is generally within the discretion of the circuit court.[17] The circuit court's determination about an expert's qualifi-

[13] Wisconsin Stat. § 907.02 reads in full: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

[14] *State v. St. George,* 2002 WI 50, ¶ 39, 252 Wis. 2d 499, 643 N.W.2d 777 (quoting 7 Daniel Blinka, *Wisconsin Practice: Wisconsin Evidence* § 702.202 at 478 (2d ed. 2001)).

[15] *St. George,* 252 Wis. 2d 499, ¶ 40 (quoting *Tanner v. Shoupe,* 228 Wis. 2d 357, 370, 596 N.W.2d 805 (Ct. App. 1999)).

[16] *St. George,* 252 Wis. 2d 499, ¶¶ 40–48; *Martindale v. Ripp,* 2001 WI 113, ¶¶ 44, 52, 246 Wis. 2d 67, 629 N.W.2d 698; 7 Blinka, *supra* note 14, § 702.4 at 489.

[17] *St. George,* 252 Wis. 2d 499, ¶ 37; *Martindale,* 246 Wis. 2d 67, ¶ 28; *State v. Watson,* 227 Wis. 2d 167, 186, 595 N.W.2d 403 (1999).

cations to testify is ordinarily a discretionary determination entitled to substantial deference. But "even evidentiary rulings may be held to account."[18] The circuit court's ruling regarding the admissibility of Dr. Wellens's expert opinion will not be disturbed unless it is an erroneous exercise of discretion.[19] A circuit court erroneously exercises its discretion if it does not examine the relevant facts, applies the wrong legal standard, or fails to use a demonstrated rational process to reach a reasonable conclusion.[20]

¶ 38. The issue, then, is whether the circuit court erroneously exercised its discretion in ruling that Shannon R. had not laid a proper foundation qualifying Dr. Wellens as an expert to testify as to whether Shannon R. is likely to be able to meet the conditions for return of her children within the 12–month period. We conclude that the circuit court erroneously exercised its discretion in barring Dr. Wellens's testimony.

¶ 39. The circuit court erred by not considering all the relevant facts; by applying the wrong legal standard; and by failing to demonstrate a rational process to reach a reasonable conclusion.

¶ 40. In deciding the issue of foundation, the circuit court seemed fixated on the psychological tests that Dr. Wellens administered and did not consider the psychologist's experience, training, interview with Shannon R., and review of the voluminous case history. Thus the circuit court did not consider all the relevant facts.

---

[18] *Martindale,* 246 Wis. 2d 67, ¶ 45.

[19] *Id.* ¶ 28; *State v. Pharr,* 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983).

[20] *Martindale,* 246 Wis. 2d 67, ¶ 45; *Morden v. Cont'l AG,* 2000 WI 51, ¶ 81, 235 Wis. 2d 325, 611 N.W.2d 659.

¶ 41. Dr. Wellens could address Shannon R.'s abilities and her future behavior based not only on his training and review of her voluminous case history but also on his personal interview with and testing of Shannon R. and from listening to the opinions of others. His expert opinion on the substantial likelihood that she is able to meet the conditions for return within the time period would have been based on a psychologist's training to understand human behavior and the information he personally had about Shannon R. and the conditions for the return of the children. His training and the information he personally acquired about Shannon R. from testing and interviewing her provided a foundation for his opinion about not only whether any psychological bar exists to Shannon R.'s completing the conditions for return of the children, but also whether Shannon R. is able to meet the conditions.

¶ 42. The circuit court erred by not applying the proper legal standard. It failed to recognize that courts ordinarily allow psychologists to opine about the future behavior of an individual. The United States Supreme Court and this court have recognized that, although it is not easy to predict future behavior and psychiatrists and psychologists are not infallible, they can opine about future behavior. Such testimony predicting behavior has been introduced in Wisconsin in numerous types of cases.[21] In the context of predicting future violent behavior by a sexual predator, this court stated: "[A]lthough predictions of future dangerousness may be

[21] *See, e.g., Barefoot v. Estelle,* 463 U.S. 880, 896–903 (1983)(dangerousness), *superceded by statute on other grounds as stated in United States v. Monroe,* 974 F. Supp. 1472 (N.D. Ga. 1997), *quoted with approval in State v. Post,* 197 Wis. 2d 279, 312, 541 N.W.2d 115 (1995) (ch. 980 case).

difficult, they are still an attainable, in fact essential, part of our judicial process."[22]

¶ 43. The circuit court concluded that "[t]here is no foundation that he has any understanding or expertise in whether she can actually do it. The social workers, on the other hand, have worked with her in the field on those very subjects, and that's why they're entitled to make that opinion." The circuit court seemed to be saying that only those experienced or trained in social work have the expertise to testify in termination of parental rights cases about the substantial likelihood of a parent's meeting the conditions for return of a child within the 12–month time period. Such a ruling is an error of law. Thus the circuit court erred as a matter of law in declaring that Dr. Wellens, a psychologist, would know so little about the subject that he should not be permitted to give his opinion. Dr. Wellens was qualified to state whether in his opinion it is likely that Shannon R. is able to meet the conditions for return within the 12–month period.

¶ 44. Furthermore, it is difficult to understand the circuit court's reasoning in excluding Dr. Wellens's opinion. We identify several reasons why the circuit court did not demonstrate a rational process to reach a reasonable conclusion.

¶ 45. First, the circuit court's analysis is demonstrably inconsistent with the question asked of Dr. Wellens. Shannon R.'s attorney asked Dr. Wellens to assess the "likelihood that [Shannon R.] *will be able* to complete" the conditions for return in 12 months. The circuit court's analysis, however, emphasizes that Dr.

---

[22] *State v. Post,* 197 Wis. 2d 279, 312, 541 N.W.2d 115 (1995) (citing *Barefoot,* 463 U.S. at 897).

Wellens lacked foundation to testify that Shannon R. "*will* finish those conditions in twelve months."

¶ 46. Second, the circuit court sustained an objection to the predictive question it later discussed approvingly. When Shannon R.'s attorney asked Dr. Wellens if he could identify "any personality characteristics that will *present a bar* to [Shannon R.'s] completing the conditions in the next twelve months[,]" the circuit court sustained the guardian ad litem's objection on lack of foundation. However, soon after sustaining this objection, the circuit court stated that Dr. Wellens could testify "whether or not his testing has evidenced any bars or prohibitions to her completing the conditions." Dr. Wellens ultimately testified that there is no bar to Shannon R. meeting the conditions but she would need help.

¶ 47. The circuit court saw a difference between asking Dr. Wellens whether or not Shannon R. "can complete the condition as opposed to asking whether or not he sees any bar based on his expertise to her completing the condition."[23]

¶ 48. Third, as Shannon R.'s attorney correctly explained in the circuit court and here, the foundation for Dr. Wellens's offering a predictive opinion was as good or better than the foundation set forth for Brown County's two witnesses who offered their opinions. Brown County's two expert witnesses, Tribal Judge Smart and Ms. Reynolds, testified, without objection,

------

[23] The court of appeals improperly conflated Dr. Wellens's excluded expert opinion testimony that Shannon R. has the capacity to meet the conditions with the admitted expert opinion testimony that she has no psychological impediments that would prevent her from meeting those conditions. *Brown County v. Shannon R.*, Nos. 2004AP1305 & 2004AP1306, unpublished slip op., ¶ 33 (Wis. Ct. App. Nov. 3, 2004).

that it was their opinion that no substantial likelihood exists that Shannon R. is able to meet the conditions for return within 12 months of the hearing.[24]

¶ 49. Yet Tribal Judge Smart did not interview Shannon R. or the children, and he did not conduct any tests. He relied on the case history and his qualifications in social work. In light of Tribal Judge Smart's qualifications, it was not reasonable for the circuit court to bar Dr. Wellens's testimony on the ground that Dr. Wellens had not "worked with her in the field."

¶ 50. Ms. Reynolds relied on her personal interaction with Shannon R., her review of the case history, and her qualifications as a social worker. Dr. Wellens also had personal interaction with Shannon R., although of significantly shorter duration than Ms. Reynolds's.

¶ 51. Dr. Wellens's training and experience is as a psychologist. His background, tests, interview, and review of the case history provides an expertise comparable to the training of Ms. Reynolds for purposes of qualifying him as an expert witness in the present case.

¶ 52. Thus, we conclude that a proper foundation was laid for Dr. Wellens's proffered testimony regarding whether Shannon R. *is able* to meet the conditions for return within the 12–month period and that the circuit

[24] In her briefs, Shannon R. suggests that Melissa Blom, a social worker, testified that Shannon R. is unable to meet her conditions of return within one year. Brief of Respondent-Appellant-Petitioner at 18–23. In fact, Ms. Blom testified only about her own interactions with Shannon R., that Brown County had met its obligations under the Indian Child Welfare Act (ICWA), that Shannon R. *had not yet* met the conditions of return, and that she thought the children would be unsafe in Shannon R.'s care. Ms. Blom was not asked to state her opinion whether Shannon R. is able to meet the conditions of return.

court erroneously exercised its discretion by excluding Dr. Wellens's expert opinion.

## III

¶ 53. The next question we must address is whether the circuit court's erroneous exercise of discretion in excluding Dr. Wellens's expert opinion was prejudicial, reversible error. The circuit court's erroneous exercise of discretion to exclude Dr. Wellens's expert opinion testimony is reversible error if it interfered with Shannon R.'s due process right to present admissible evidence central to her defense.[25]

¶ 54. Shannon R. argued in the court of appeals and in this court that it was fundamentally unfair to preclude Dr. Wellens's expert opinion testimony. She argued in each court that it was especially unfair that Brown County's experts' opinions were admitted but the expert opinion testimony of Shannon R.'s expert was not.

¶ 55. The court of appeals addressed the fairness issue and simply stated that fundamental fairness did not require admitting Dr. Wellens's testimony.[26]

---

[25] *See Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) ("A fundamental requirement of due process is 'the opportunity to be heard.' It is an opportunity which must be granted at a meaningful time and in a meaningful manner." (quoted source omitted)). *See also St. George*, 252 Wis. 2d 499, ¶ 52 ("[E]xclusion of evidence is 'unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.' The weighty interest of the defendant is to present 'fundamental elements' of his defense." (quoted source omitted)).

[26] *Brown County v. Shannon R.*, Nos. 2004AP1305 & 2004AP1306, unpublished slip op., ¶ 37 (Wis. Ct. App. Nov. 3, 2004) (" 'Fundamental fairness' does not require that Wellens be allowed to testify to the ultimate issue merely because Smart's unobjected-to testimony encompassed the issue.").

306

¶ 56. The due process protections of the 14th Amendment[27] apply in termination of parental rights cases.[28] When the State seeks to terminate familial bonds, it must provide a fair procedure to the parents, even when the parents have been derelict in their parental duties.[29]

¶ 57. The nature and extent of the process due to a party depends on the nature of the case and is influenced by the grievousness of the loss which may be suffered. Determining what due process requires in any particular case must begin with an analysis of the government function involved and the private interest affected by the governmental action.[30] A court balances the private interests, the risk of an erroneous depriva-tion of the interests through the procedures used, and the government interests in determining the process due. The factors to be weighed are set forth in *Mathews v. Eldridge,* 424 U.S. 319, 334–35 (1976), as follows:

> [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous depri-vation of such interest through the procedures used, and the probative value, if any, of additional or substi-tuted procedural safeguards; and finally, the Government's interest, including the function involved

---

[27] "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."

[28] *Santosky v. Kramer,* 455 U.S. 745, 754–70 (1982); *Lassiter,* 452 U.S. at 27–32.

[29] *Santosky,* 455 U.S. at 753–54; *Lassiter,* 452 U.S. at 27–32.

[30] *Wolff v. McDonnell,* 418 U.S. 539, 560 (1974); *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972).

and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

¶ 58. A parent's private interest in a termination of parental rights proceeding is a grievous loss, namely the permanent deprivation of a legal relationship with his or her child. Termination "work[s] a unique kind of deprivation."[31] "[T]he removal of a child from the parent is a penalty as great [as], if not greater, than a criminal penalty . . . ."[32]

¶ 59. Although they are civil proceedings,[33] termination of parental rights proceedings deserve heightened protections because they implicate a parent's fundamental liberty interest.[34] Parents have a fundamental, constitutionally protected liberty interest in the "companionship, care, custody, and management" of their children.[35] The United States Supreme Court has repeatedly declared that "personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment."[36] "[A] parent's desire for

---

[31] *M.L.B. v. S.L.J.*, 519 U.S. 102, 127–28 (1996); *see Lassiter*, 452 U.S. at 27.

[32] *Santosky*, 455 U.S. at 769 (quoting H.R. Rep. No. 95–1386, at 22 (1978)).

[33] *See M.W. v. Monroe County Dep't of Human Servs.*, 116 Wis. 2d 432, 442, 342 N.W.2d 410 (1984).

[34] *See Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶¶ 20–21, 246 Wis. 2d 1, 629 N.W.2d 768; *L.K. v. B.B.*, 113 Wis. 2d 429, 441, 335 N.W.2d 846 (1983) (citing *Santosky*, 455 U.S. at 769); *In re J.L.W.*, 102 Wis. 2d 118, 132, 306 N.W.2d 46 (1981).

[35] *In re D.L.S.*, 112 Wis. 2d 180, 184, 332 N.W.2d 293 (1983).

[36] *Santosky*, 455 U.S. at 753; *see Lassiter*, 452 U.S. at 24–32; *Lassiter*, 452 U.S. at 59–60 (Stevens, J., dissenting); *see also*

and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' "[37] "Terminations of parental rights affect some of parents' most fundamental human rights.' "[38]

¶ 60. The State has an urgent interest in a termination of parental rights proceeding to protect the welfare of the children.[39] An important aspect of a child's welfare is a parent's relationship with the child.

¶ 61. Accordingly, the State and parent share an interest in the accuracy and justice of the decision to terminate parental rights.[40]

¶ 62. The protection of a parent's interests in termination of parental rights proceedings is particularly important in light of the "vast disparity in an involuntary termination case between the ability of the state to prosecute and the ability of the parent to defend."[41] The United States Supreme Court has described the formidable task a parent faces in defending

*Quilloin v. Walcott,* 434 U.S. 246, 255 (1978); *Smith v. Org. of Foster Families,* 431 U.S. 816, 845 (1977); *Moore v. City of East Cleveland,* 431 U.S. 494, 499 (1977) (plurality opinion).

[37] *Lassiter,* 452 U.S. at 27 (quoting *Stanley v. Illinois,* 405 U.S. 645, 691 (1972)).

[38] *Evelyn C.R.,* 246 Wis. 2d 1, ¶ 20; *see D.L.S.,* 112 Wis. 2d at 184; *Minguey v. Brookens,* 100 Wis. 2d 681, 689, 303 N.W.2d 581 (1981).

[39] *Lassiter,* 452 U.S. at 27.

[40] *Id.; D.L.S.,* 112 Wis. 2d at 185.

[41] *A.S. v. State,* 163 Wis. 2d 687, 704, 472 N.W.2d 819 (Ct. App. 1991) (Sundby, J., dissenting), cited with approval in *A.S. v. State,* 168 Wis. 2d 995, 1003, 485 N.W.2d 52 (1992).

herself against the involuntary termination of parental rights as follows:

> The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense. No predetermined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The State's attorney usually will be expert on the issues contested and the procedures employed at the fact-finding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional case-workers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.[42]

¶ 63. Considering that the process due depends on the fundamental liberty interests of the parent, the State's urgent interest in the welfare of children and in the accuracy of a decision terminating parental rights, and the disparity between the ability of the State to prosecute and the ability of a parent to defend in termination proceedings, we now must determine what process was due in this termination of parental rights case regarding the admission of Dr. Wellens's expert opinion.

¶ 64. A fundamental guarantee of due process of law is the opportunity to be heard[43] "at a meaningful time and in a meaningful manner."[44] "The right to be

---

[42] *Santosky,* 455 U.S. at 763.

[43] *Grannis v. Ordean,* 234 U.S. 385, 394 (1914) (civil case).

[44] *Armstrong,* 380 U.S. at 552 (civil case).

heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society."[45]

¶ 65. The opportunity to be heard includes the right to "present a complete defense."[46] The right to present a complete defense, in turn, includes the right to offer the testimony of witnesses.[47] The constitutional right to be heard is not so broad as to preclude the State from establishing rules of evidence and procedure that impose limits on a party's ability to present evidence, including limits on the testimony of expert witnesses.[48]

¶ 66. Here, the rules of evidence did not limit Shannon R.'s ability to be heard or present evidence. Rather, the circuit court's erroneous application of an evidentiary rule interfered with Shannon R.'s ability to be heard by preventing her from putting forth her defense through Dr. Wellens's expert opinion.

¶ 67. To summarize: The parent's interest and the State's interest in termination of parental rights proceedings are both extremely important; the State and parent share an interest in an accurate decision; due process guarantees a parent the opportunity to be heard and present a defense; and the State has no

---

[45] *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring) (civil case).

[46] *California v. Trombetta,* 467 U.S. 479, 485 (1984); *see United States v. Scheffer,* 523 U.S. 303, 308 (1998); *State v. Pulizzano* 155 Wis. 2d 633, 645, 456 N.W.2d 325 (1990).

[47] *Washington v. Texas,* 388 U.S. 14, 19 (1967).

[48] *United States v. Scheffer,* 523 U.S. 303, 308, 316 (1998); *St. George,* 252 Wis. 2d 499, ¶ 49.

interest in depriving a parent of the right to be heard when the evidence presented is admissible under the rules of evidence.

¶ 68. The question then is whether Shannon R. was given the opportunity to be heard at a meaningful time and in a meaningful manner when the circuit court erroneously excluded Dr. Wellens's expert opinion evidence. The circuit court's erroneous exclusion of Dr. Wellens's opinion testimony violates basic concepts of due process if the circuit court denied Shannon R. the opportunity to be heard, that is, if it denied her the ability to present a defense on whether she will meet the conditions for the return of her children, a central issue of the case. Shannon R.'s interest was to present a defense in regard to the "fundamental elements" justifying termination.[49]

---

[49] *St. George,* 252 Wis. 2d 499, ¶ 52 (quoting *Scheffer,* 523 U.S. at 315 (internal quotation marks omitted)); *see St. George,* 252 Wis. 2d 499, ¶ 81 (Sykes, J., concurring) ("If it were not so central to the defendant's case, the decision whether to qualify the defense expert under Wis. Stat. § 907.02 could have gone either way and been upheld.").

In *St. George,* in the context of the Sixth Amendment right to present a defense, we set out the following factors to determine whether the right to present a defense has been violated:

1) The expert witness's testimony meets the requirements of Wis. Stat. § 907.02 for the admission of expert testimony;

2) The expert witness's testimony is clearly relevant to a material issue in this case;

3) The expert witness's testimony is necessary to the defendant's case; and

4) The probative value of the testimony is not outweighed by its prejudicial effect.

¶ 69. A proper foundation was laid for Dr. Wellens's testimony. His testimony met the standards of Wis. Stat. § 907.02; it was relevant to a material issue, that is, the substantial likelihood that Shannon R. will meet the conditions for the return of the children within the 12–month period. His testimony would have assisted the jury; it was necessary to Shannon R.'s case; and admission of the testimony had no prejudicial effect on the State.

¶ 70. Besides Shannon R. herself, Dr. Wellens was one of only two witnesses Shannon R. called. Dr. Wellens was the only expert Shannon R. called to testify that she is able to meet the conditions for return within the 12–month period. Because Dr. Wellens's expert opinion testimony was excluded, the jury heard no direct testimony contravening Brown County's witnesses' opinions that Shannon R. is not able to meet the conditions for return within 12 months. Preventing a parent from presenting expert opinion testimony on an issue central to the defense when the State presents the testimony of two experts deprives the parent "of a level playing field,"[50] especially when a vast disparity already exists between the State's and the parent's resources. "If one side is to introduce testimony by a psychological expert who has examined the victim, the other side must also be able to request such an opportunity in order to level the playing field."[51]

St. George, 252 Wis. 2d 499, ¶ 54. Although St. George does not control cases decided under the due process clause of the Fourteenth Amendment, it informs our discussion in the present case.

[50] State v. Maday, 179 Wis. 2d 346, 507 N.W.2d 365 (Ct. App. 1993).

[51] State v. Rizzo, 2002 WI 20, ¶ 26, 250 Wis. 2d 407, 640 N.W.2d 93.

¶ 71. The State's interest in terminating parental rights promptly does not outweigh the requirements of fundamental fairness and Shannon R.'s constitutionally protected due process right to be heard in a meaningful manner. It would have imposed no burden on the State to allow Shannon R. to present her qualified expert witnesses.

¶ 72. In light of the important constitutional right at stake, the State's interest in an accurate decision, the fundamental fairness of giving a party the opportunity to defend, and Shannon R.'s inability to present evidence on an issue central to the outcome of the case, we hold that the circuit court's erroneous preclusion of Dr. Wellens's expert opinion testimony (the only expert opinion testimony Shannon R. proffered on an issue central to her defense) denied her the due process right to present a defense and goes to the fundamental fairness of the proceeding. We therefore hold that the circuit court committed prejudicial, reversible error.

## IV

¶ 73. Because we remand this cause, we discuss two issues that might arise on retrial.

## A

¶ 74. Shannon R. contends that the circuit court lost competence to decide the termination proceeding because it failed to hold the initial appearance within 30 days as required by Wis. Stat. § 48.422(1).

¶ 75. The dates at which various events occurred are as follows.

¶ 76. On May 29, 2003, a petition for termination of parental rights as to Daniel, the younger child, was filed in Brown County. That case was assigned to Judge Sue Bischel. The initial appearance was held within the time requirements of Wis. Stat. § 48.422.

¶ 77. On September 2, 2003, Brown County filed a petition for the termination of parental rights as to Darell, the older child. This case was assigned to Judge Richard J. Dietz.

¶ 78. On September 4, 2003, Brown County petitioned to consolidate the two cases. Judge Bischel held a hearing on the consolidation petition on September 18, 2003, granted the consolidation on September 26, 2003, and assigned the case to Judge Dietz.

¶ 79. On September 29, 2003, Judge Dietz declared that he would ask the district court administrator to reassign the consolidated cases because, with four other involuntary termination of parental rights proceedings on his calendar, he would be unable to meet the statutory time period requirements for this TPR proceeding.

¶ 80. The application for judicial reassignment was dated September 30, and the order assigning the proceedings to Judge McKay was filed October 1. Both the application and the order cited "congestion" as the reason for the reassignment. The initial appearance for the consolidated matter began on October 23 and continued on October 27.

¶ 81. In view of our decision that the circuit court erroneously excluded Dr. Wellens's expert opinion, we need not determine whether the time period was extended under § 48.315 and whether the circuit court complied with the 30–day time requirement.

¶ 82. Rather, we take this opportunity to reiterate the admonition set forth in *Sheboygan County Depart-*

315

*ment of Social Services v. Matthew S.*, 2005 WI 84, 282 Wis. 2d 150, 698 N.W.2d 631, that " '[t]he legislative history of the Children's Code shows that the legislature considers that strict time limits between critical stages within the adjudication process are necessary to protect the due process rights of children and parents.' "[52]

¶ 83. Of particular import here is that the motion for consolidation was made on September 4, 2003, and was not granted until 22 days later, on September 26. A reasonable delay for the purposes of consolidation is excluded, under Wis. Stat. § 48.315 (1)(g), in computing the time requirements.

¶ 84. Daniel and Darell's termination cases passed between two judges and finally were consolidated by assignment to a third judge because of docket congestion. Assignment of the case to the final judge was effected on October 1, five days after the consolidation.

¶ 85. Neither the circuit court nor the court of appeals determined the reasonableness of the 22 days (or any part thereof) that elapsed before the motion for consolidation was decided. Rather, both courts resolved the question of whether the 30–day time period was met by declaring that reassignment of a judge because of docket congestion was a disqualification of the judge under Wis. Stat. § 48.315(1)(c).[53]

---

[52] *Sheboygan County Dep't of Soc. Servs. v. Matthew S.*, 2005 WI 84, ¶ 17, 282 Wis. 2d 150, 698 N.W.2d 631 (quoting *In re R.H.*, 147 Wis. 2d 22, 33, 433 N.W.2d 16 (Ct. App. 1988), *aff'd by equally divided court*, 150 Wis. 2d 432, 441 N.W.2d 233 (1989)). For a discussion of the legislative history of the Children's Code, *see, e.g., In re R.H.*, 147 Wis. 2d 22, 31, 433 N.W.2d 16 (Ct. App. 1988).

[53] Wisconsin Stat. § 48.315(1)(c) provides in part as follows:

¶ 86. The court of appeals relied on *State v. Joshua M.W.*, 179 Wis. 2d 335, 341, 507 N.W.2d 141 (Ct. App. 1993), for the proposition that reassignment of a judge because of docket congestion amounts to disqualification of a judge under Wis. Stat. § 48.315(1)(c). *Joshua M.W.* does not support this broad reading of § 48.315(1)(c). In *Joshua M.W.*, the juvenile requested a substitution of judge and conceded that the time period from the date of the request to the date of assignment of a substitute judge was excluded from the applicable time computation as a disqualification of a judge. Under the statutes, when a motion to substitute a judge is properly filed, the named judge "has no further jurisdiction." Wis. Stat. § 801.58. A substitution may therefore be viewed as disqualification of a judge. This case does not involve substitution of a judge.

¶ 87. Nor does this case involve any of the statutory grounds for disqualification of a judge. Docket congestion is not a ground for disqualification under Wis. Stat. § 757.19 governing disqualification of judges.

¶ 88. The parties cite no support for the conclusion that disqualification of a judge under Wis. Stat. 48.315(1)(c) includes the reassignment of a judge because of docket congestion, and we have found none.

¶ 89. Furthermore, if we were to read Wis. Stat. § 48.315(1)(c) to allow reassignment of a judge because of docket congestion to constitute disqualification of a judge, then termination of parental rights proceedings could be passed between circuit courts simply because

(1) The following time period shall be excluded in computing time requirements in this chapter:

. . . .

(c) Any period of delay caused by the disqualification of a judge.

317

of congestion. This court understands well the docket pressures in the circuit courts. Such pressures do not, however, relieve circuit courts of their responsibility to follow the strict time limits prescribed in the Children's Code and the legislative requirement that these matters be handled within these time limits. We do not determine whether the statutory time limits were met in the present case. Nor do we consider whether the record in the present case relating to congestion supports good cause for not holding the initial appearance within 30 days as required by Wis. Stat. § 48.422(1). We do conclude, however, that reassignment of a case to a different judge because of docket congestion does not constitute disqualification of a judge under Wis. Stat. § 48.315(1)(c).

B

¶ 90. A second issue we address relates to the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901–1963.

¶ 91. The ICWA governs proceedings involving Indian children as defined in the act. The parties, the circuit court, and the court of appeals agree that the ICWA applies in the present case.

¶ 92. Shannon R. argues that the circuit court erroneously instructed the jury about Brown County's burden of proof on the special verdict questions.

¶ 93. The circuit court directed the jury in the present case to apply two different burdens of proof to the two sets of special verdict questions. As to the first four special verdict questions embodying state law, the circuit court instructed the jury to answer the questions "yes" if Brown County proved those elements to a reasonable certainty by evidence that is clear, satisfac-

318

tory, and convincing.[54] As to the last three special verdict questions embodying the ICWA, the circuit court instructed the jury to answer "yes" if Brown County proved those elements beyond a reasonable doubt.[55]

¶ 94. The first four special verdict questions incorporate state law requirements. The burden of proof under the Wisconsin Children's Code (Chapter 48 of the Statutes) to terminate parental rights is clear and convincing evidence (the middle burden).[56]

---

[54] The first four special verdict questions are: (1) "Has the child . . . been adjudicated to be in need of protection or services and placed outside the home for a cumulative total period of six (6) months or longer pursuant to one or more court orders containing the termination of parental rights notice required by law?[;]" (2) "Did the Brown County Human Services Department and/or the Bad River Tribal Nation Social Services make a reasonable effort to provide the services ordered by the Court?[;]" (3) "Has Shannon R[.] failed to meet the conditions established for the safe return of the child to the home?[;]" and (4) "Is there a substantial likelihood that Shannon R[.] will not meet these conditions within the twelve-month period following the conclusion of this hearing?"

[55] The last three special verdict questions are: (5) "Have the Brown County Human Services [sic] and/or the Bad River Tribe of Indians of Wisconsin, through its Social Services Department, made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family?[;]" (6) "Have the efforts of the Brown County Human Services Department and/or the Bad River Tribal Nation Social Services [sic] to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family proven unsuccessful?[;]" and (7) "Would the return of custody of the child to Shannon R[.] likely result in serious emotional or physical damage to the child?"

[56] Wis. Stat. § 48.31(1).

319

¶ 95. The last three special verdict questions incorporate federal law requirements under the ICWA. Special verdict questions 5 and 6 incorporate the requirements set forth in 25 U.S.C. § 1912(d); section 1912(d) does not, however, provide an applicable burden of proof.[57] Special verdict question 7 incorporates the requirement set forth in § 1912(f). Section 1912(f) provides that the burden of proof for this element is "beyond a reasonable doubt" (the highest burden).[58]

¶ 96. Our court has held that the ICWA does not preempt the Wisconsin Children's Code;[59] that the different burdens of proof under the state law and under the ICWA (25 U.S.C. § 1912(f)) can be harmonized with the middle burden of proof applied to state law requirements for termination and the highest burden of proof applied to requirements set forth in 25 U.S.C. § 1912(f);[60] and that "the ICWA expressly calls for the use of state law rather than the ICWA if the state law 'provides a higher standard of protection' than

---

[57] 25 U.S.C. § 1912(d) provides: "Any party seeking to effect a foster child placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

[58] 25 U.S.C. § 1912(f) provides:

No termination of parental rights may be ordered in such proceedings in the absence of a determination supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

[59] *In re D.S.P.,* 166 Wis. 2d 464, 473, 480 N.W.2d 234 (1992).

[60] *Id.* at 474.

that accorded by the ICWA."[61] These holdings comport with the case law of several other states.[62]

¶ 97. Shannon R. argues that the state law grounds are not distinct from the ICWA grounds and that therefore the circuit court erred as a matter of law in instructing the jury to apply the middle burden of proof. More specifically, Shannon R. argues that special verdict questions 2 and 3 are essentially the same as special verdict questions 5 and 6 and that the circuit court should have instructed the jury that Brown County's burden of proof for special verdict questions 2 and 3 was beyond a reasonable doubt.

---

[61] *Id.* at 473.

[62] For state courts adopting a dual burden of proof in ICWA cases, see, *e.g., K.N. v. State,* 856 P.2d 468, 476–77 (Alaska 1993); *In re J.R.B. & T.W.G.,* 715 P.2d 1170, 1171 (Alaska 1986); *In re H.A.M.,* 961 P.2d 716, 719 (Kan. Ct. App. 1998); *In re Denice F.,* 658 A.2d 1070, 1072–73 (Me. 1995); *Elliott v. Boyd,* 554 N.W.2d 32, 38 (Mich. Ct. App. 1996); *In re Bluebird,* 411 S.E. 2d 820, 823 (N.C. Ct. App. 1992); *K.E. v. State,* 912 P.2d 1002, 1005 (Utah Ct. App. 1996); *In re Dependency of Roberts,* 732 P.2d 528, 531 (Wash. Ct. App. 1987).

In contrast, the Oklahoma Supreme Court has adopted the beyond a reasonable doubt standard for both the state law requirements and the requirements in 25 U.S.C. § 1912(f). The Introductory Note to the Oklahoma Uniform Jury Instructions for Juvenile Cases, *In re Oklahoma Uniform Jury Instructions for Juvenile Cases,* 116 P.3d 119, 163 (Okla. 2005), explains its reasons for adopting the single beyond a reasonable doubt standard as follows: the prevailing practice in Oklahoma trial courts has been to use the reasonable doubt standard for both the state law requirements for termination of parental rights and the requirements in 25 U.S.C. § 1912(f); a single standard is less confusing for the jury than a dual standard; and the higher standard gives greatest effect to the ICWA and is less likely to result in reversal.

¶ 98. The court of appeals addressed this argument under ineffective assistance of counsel because Shannon R.'s counsel did not object to the jury instructions. Without deciding whether counsel's performance was deficient, the court of appeals concluded that Shannon R. failed to show that the instructions were prejudicial.

¶ 99. We are not persuaded by Shannon R.'s arguments that these special verdict questions are functionally equivalent. We conclude that the state law grounds embodied in the first four special verdict questions are sufficiently distinct from the ICWA grounds embodied in the last three special verdict questions. Although the jury may consider the same evidence to answer the several special verdict questions, the critical questions asked and the ultimate findings required by the jury are not precisely the same.

¶ 100. We identify two distinctions between the ultimate findings required of the jury by these questions. First, the type of efforts to be provided may be different. Special verdict question 2 requires *reasonable effort* be made to provide the services "ordered by the Court" in the CHIPS proceeding to make the home safe for the child. Special verdict question 5, on the other hand, requires *active efforts* to provide "remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."

¶ 101. Second, the special verdict questions identify different goals. Although one of the goals of Chapter 48 is "to preserve the unity of the family," special verdict question 3 focused on Shannon R. meeting the conditions for the safe return of the children to the home. Special verdict questions 5 and 6 relating to the remedial and rehabilitative services focused on prevent-

ing the breakup of the Indian family and whether the efforts of the remedial services and rehabilitative programs designed to prevent the breakup of the Indian family have proven unsuccessful.

¶ 102. Thus, we conclude that special verdict questions 2 and 3 are analytically distinct from special verdict questions 5 and 6.

¶ 103. Neither party briefed whether the ICWA requires Brown County to prove special verdict questions 5 and 6, which incorporate 25 U.S.C. § 1912(d), beyond a reasonable doubt. Special verdict question 7 (incorporating 25 U.S.C. § 1912(f)) must be proved beyond a reasonable doubt. Section 1912(d), unlike § 1912(f), does not set forth an applicable burden of proof. The parties and court of appeals assumed that the beyond a reasonable doubt burden applicable to special verdict question 7 applied to special verdict questions 5 and 6.

¶ 104. We do not address or decide, however, whether special verdict questions 5 and 6 (incorporating 25 U.S.C. § 1912(d)) must be proved beyond a reasonable doubt. We merely point out that state courts have divided about the appropriate burden of proof to be applied to special verdict questions incorporating § 1912(d).[63]

---

[63] *See In re Michael G.,* 74 Cal. Rptr. 2d 642 (Cal. Ct. App. 1998) (holding the ICWA beyond a reasonable doubt standard applies only to a special verdict question (here special verdict question 7) relating to whether the return of custody of the child to the parent is likely to result in serious emotional or physical damage to the child); *In the Interest of D.G.,* 679 N.W.2d 497 (S.D. 2004) (following the same rule as *Michael G.*); *In re Baby Boy Doe,* 902 P.2d 477 (Idaho 1995) (same); *In re Annette P.,* 589 A.2d 924 (Me. 1991) (same).

¶ 105. In sum, we conclude that the constitutional guarantee of due process (fundamental fairness) requires the conclusion that by excluding Shannon R.'s only expert opinion testimony, which was clearly central to her defense against termination of her parental rights, the circuit court committed reversible error. We therefore reverse the decision of the court of appeals and remand the cause to the circuit court for further proceedings not inconsistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded.

¶ 106. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). The majority opinion overturns the termination of Shannon R.'s parental rights to Darell and Daniel, both of whom have been out of her home for more than three years. The majority bases its decision on an evidentiary ruling that prevented Shannon from obtaining one answer to one question from one person over the course of a three-day jury trial. In order to achieve a reversal, the majority converts the evidentiary question that was presented into a constitutional issue. Majority op., ¶¶ 65–66. It does so by constructing a rationale that was never presented to the circuit court and by ignoring the need that two young boys have for a permanent home.

---

But see *Dep't of Soc. Servs. v. Lawless*, 384 N.W.2d 843 (Mich. Ct. App. 1986) (applying beyond a reasonable doubt burden to 25 U.S.C. § 1912(d) (the source of special verdict questions 5 and 6 in the present case); *In re L.N.W.*, 457 N.W.2d 17 (Iowa Ct. App. 1990) (same); *In re M.S.S.*, 465 N.W.2d 412 (Minn. Ct. App. 1991) (same); *In re G.S.*, 59 P.3d 1063 (Mont. 2002) (same).

¶ 107. I conclude that the circuit court did not err in its evidentiary ruling, and even if it erred, it was harmless error; that the majority opinion's analysis of the constitutional issue it constructs is flawed; and that the majority opinion ignores the legislature's explicit direction that the best interests of the child are to be paramount in ch. 48 proceedings. Accordingly, I would affirm the court of appeals and I respectfully dissent from the majority opinion.

## I. BACKGROUND

¶ 108. Shannon R. is the mother of Darell, a four-year-old boy, and Daniel, a three-year-old boy. Darell was removed from Shannon's care less than one month after his birth. He has resided in foster care since that time. Daniel was removed from Shannon's care at birth. He has never resided with Shannon. The record shows that the precipitating event for Darell's removal from Shannon's custody was the death of his sister, Tianna. She was found dead in her crib due to hyperthermia and dehydration. The record revealed that neither Shannon nor the father of Tianna, both of whom lived in the same residence, had had any physical contact with her for 17 hours prior to her death.

¶ 109. Since October 25, 2001, a dispositional order has been in place setting out those tasks that Shannon must do in order to regain custody of Darell. A similar order has been in place with regard to regaining custody of Daniel since August 5, 2002. Notice was given to Shannon when the orders were issued that if she did not meet the conditions necessary for the safe return of the boys, her parental rights could be terminated.[1]

---

[1] Shannon repeatedly testified to her understanding that failing to meet the conditions necessary for the safe return of the boys to her home could result in the termination of her parental rights.

¶ 110. After a three-day jury trial in which eight witnesses, including Shannon, testified, the jury found that Shannon had failed to meet the conditions necessary for the safe return of the children to her home and that there was a "substantial likelihood" that Shannon would not meet the conditions within the 12–month period following the conclusion of the jury trial. The jury also found that the return of the boys to Shannon's custody would "likely result in serious emotional or physical damage to the [children]."

## II. DISCUSSION

### A. Standard of Review

¶ 111. We review the evidentiary decisions of the circuit court to determine whether it erroneously exercised its discretion. *Loy v. Bunderson,* 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982). We will sustain an evidentiary ruling if the circuit court considered the relevant facts, applied the correct rule of law and came to a conclusion that a reasonable judge could reach. *State v. Cofield,* 2000 WI App 196, ¶ 7, 238 Wis. 2d 467, 618 N.W.2d 214. We determine as a question of law whether a defendant has been denied the constitutional right to make a defense. *See State v. St. George,* 2002 WI 50, ¶ 49, 252 Wis. 2d 499, 643 N.W.2d 777.

### B. Evidentiary Rulings

#### 1. Expert testimony

¶ 112. Dr. Gerald Wellens is a licensed psychologist whom Shannon retained for trial. He interviewed Shannon for two hours, conducted four types of psychological tests, read the reports of her parole agent, that of

326

a counselor and those of the social workers, as well as the record of past court proceedings involving Darell and Daniel. Based on that foundation, Shannon proposed to offer Wellens's expert opinion on special verdict question 4, which read: "Is there a substantial likelihood that Shannon R[.] will not meet [the conditions for the safe return of the children to her home] within the twelve-month period following the conclusion of this hearing?" The jury answered the question, "Yes."

¶ 113. The question put to Wellens to which the circuit court sustained an objection based on a lack of foundation was:

> Based upon your years of experience as a psychologist, based upon your review of the three volumes of materials, based upon your interview with [Shannon], and based upon the four psychological instruments that you have utilized to test her, are you able to a reasonable degree of psychological certainty to reach an opinion as to the likelihood of her ability to complete these conditions as they now stand within the next twelve months?

The problem the court had with the foundation that counsel had laid for the question was in part a temporal one, i.e., whether Shannon *would meet* the conditions for the safe return of the children *within the 12 months after the trial.* The court concluded that nothing in Wellens's prior testimony established that he had expertise in predicting what Shannon *would accomplish within that 12–month period.* However, the court patiently explained the type of questions that would be permitted:

> I'm going to allow you to ask questions, if you choose to do so, as to whether or not the counseling—excuse me—the testing that he undertook and the conclusions

that he's reached as a result of that regarding her personality and psychological traits will be a bar to anything. You can ask those. But you keep making a hurdle to whether that prevents her from doing the conditions *within the next twelve months,* and he can't answer that. He can't make that leap. He can tell you whether his test results and his evaluation present any bars to her, *but he can't conclude that i.e., therefore, she will finish those conditions in twelve months.* (Emphasis added.)

¶ 114. The guardian ad litem also tried to explain a question that could be asked and to which she would make no objection. She posed the following question: "Is there anything that has come out of these testings that would—as you said, Your Honor— that would pose as a bar to her completing these conditions? I won't object to that question." The court tried repeatedly to explain why Wellens's testing, two hours of interview time and reading the reports of others did not form a foundation for him to opine what Shannon actually would do in the next 12 months, and counsel tried valiantly to understand the court's concern. However, the record is clear that the court and counsel were talking past each other. Nonetheless, following a lengthy colloquy among counsel, the guardian ad litem and the court, these questions and answers were presented before the jury:

Q Is there anything in the testing results that you performed in your professional capacity and the conclusions you reached in your professional capacity that lead you to believe that there is a bar or—inability or bar to Miss Shannon obtaining stable and suitable housing in the future for herself and her children?

A I don't believe that there is a bar. ...

328

Q Was there anything in your testing or professional conclusions that led you to believe that there is a bar to Miss R[.] obtaining stable employment in the future?

A No. ...

Q Well, rather than go through all of her conditions one by one in each court order, are there any psychological impediments that prevent her from completing any of the conditions that are listed?

A No.

From the questions and answers above, the jury could have inferred that it was substantially likely that Shannon would meet the conditions necessary for the children to return to her home safely, but it did not do so.

¶ 115. Wellens's expert opinion was also offered on special verdict question 7, which read: "Would the return of custody of the [children] to Shannon R[.] likely result in serious emotional or physical damage to the [children]?" The jury also answered this question, "Yes." There was no objection to the testimony counsel elicited from Wellens in regard to special verdict question 7. Shannon's question was asked and answered as follows:

Q What is your expert opinion as to whether or not the return of Daniel and Darell to the custody of their mother, Shannon, is likely to result in serious emotional or physical damage to the children . . .?

A As a psychologist I—in evaluating Shannon, I—she strives to be a good mother. She's making

329

progress, in my opinion, psychologically, and I don't see that there would be a likelihood that there would be damage to these children from what I've read in the notes and evaluating her.

2. Exercise of discretion

¶ 116. Expert testimony generally is admitted if it is relevant to the issue to be decided and will assist the trier of fact in coming to a decision. Wis. Stat. §§ 904.01 and 907.02 (2003–04).[2] However, expert testimony *is required* on an issue only if the issue that the jury must decide is "beyond the general knowledge and experience of the average juror." *State v. Whitaker,* 167 Wis. 2d 247, 255, 481 N.W.2d 649 (Ct. App. 1992). Additionally, an expert may testify only "within the areas in which he or she is qualified." *Herman v. Milwaukee Children's Hosp.,* 121 Wis. 2d 531, 551, 361 N.W.2d 297 (Ct. App. 1984).

¶ 117. Before ruling, the circuit court considered that Wellens had limited exposure to Shannon's past noncompliance with the court-ordered conditions for the return of Darell and Daniel, except for reading the records made by others. In deciding whether the testimony would aid the trier of fact, the court understood that Shannon's tests showed she had the ability to meet the county's conditions for the return of the children. However, the court found that was not necessarily transferable into a reliable opinion that Shannon would actually meet the conditions in the next 12 months.

¶ 118. I conclude that the rationale the circuit court applied was reasonable, given that if the opposite were true, i.e., because Shannon had the ability to meet

---

[2] All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

the conditions, she would do so in the next 12 months, Shannon would have met those conditions in the more than 25 months that both boys had been in the custody of the county. And while it may be true that some judges may have let in the testimony as counsel initially phrased the question, that is not the legal test we use when examining an evidentiary ruling. *State v. McConnohie,* 113 Wis. 2d 362, 370, 334 N.W.2d 903 (1983) (concluding that a discretionary ruling that is made on the facts and the correct law must be upheld, even though the reviewing court does not necessarily agree with the ruling).

¶ 119. Further, Shannon never argued that if the court refused to permit her to phrase the question as she chose, it would deny her constitutional right to present a defense, so the circuit court did not address that contention. Accordingly, because the circuit court considered the relevant facts, applied a correct standard of law and reached a conclusion that a reasonable judge could have reached, there was no erroneous exercise of discretion. *Cofield,* 238 Wis. 2d 467, ¶ 7.

### 3. Harmless error

¶ 120. If I were to assume, arguendo, that the circuit court erred by sustaining the objection to the question, the error was harmless because the questions that were asked and answered differed little in regard to their phrasing and import from that which was not permitted. *See Teasdale v. Teasdale,* 264 Wis. 1, 7, 58 N.W.2d 404 (1953) (concluding that the opinion of trustees that had been rejected on a prior appeal was not improved by the document offered because the document did not differ in character and import from that which had been presented previously). Furthermore, Wellens was not the only witness who testified on

Shannon's behalf relative to whether she would meet the conditions for the safe return of the children to her home. Shannon, herself, took the stand and explained that she would meet those conditions in the next 12 months.

¶ 121. In addition, it is not clear to me that the jury needed expert testimony in order to answer special verdict question 4. Generally, expert testimony will assist the jury when the issue to be decided is based on an analysis that would be difficult for the ordinary person in the community to apply. *State v. Blair*, 164 Wis. 2d 64, 74–75, 473 N.W.2d 566 (Ct. App. 1991). However, expert testimony is not always required in those cases; "expert testimony is *required* only if the issue to be decided by the jury is beyond the general knowledge and experience of the average juror." *Whitaker*, 167 Wis. 2d at 255.

¶ 122. Here, special verdict question 4 inquired whether there was a substantial likelihood that Shannon would not meet the conditions necessary for the safe return of the boys to her custody in the next 12 months. Special verdict question 3 asked whether Shannon previously had failed to meet those same conditions. The jury answered this question, "Yes," too. The testimony showed she had repeatedly failed to attend scheduled visitations with the boys; she did not continue in counseling; she continued to commit crimes; she failed to maintain stable housing; and she repeatedly failed to be employed over a period of 25 months.

¶ 123. Nothing in Shannon's testimony showed a change in circumstances that would indicate that her performance in the next 12 months would be different from what it had been in the previous 25 months. It is within the common experience of mankind that past performance is a good indicator of future performance.

It is that kind of common knowledge that we recognize as "reputation." For example, the past experiences of a community with an individual may give that person a reputation for being honest and kind, or for being deceitful and cruel. Therefore, in my view, expert testimony was not needed to answer special verdict question 4.[3]

## C. Constitutional Right to Present a Defense

¶ 124. A defendant in a criminal trial has a constitutional right to present a defense to the charges against him. *State v. Pulizzano,* 155 Wis. 2d 633, 645, 456 N.W.2d 325 (1990). This right is "grounded in the confrontation and compulsory process clauses of Article I, Section 7 of the Wisconsin Constitution and the Sixth Amendment of the United States Constitution." *Id.* While the constitutions of the state and federal governments guarantee a defendant a fair trial, what is required to achieve a fair trial is defined in the several provisions of Article I, Section 7 of the Wisconsin Constitution and the Sixth Amendment of the United

---

[3] The majority opinion makes much of the county's presentation of opinion testimony by the social workers assigned to Shannon and Tribal Judge Smart, and contends that permitting their testimony while refusing to permit Wellens to testify in the way Shannon proposed is an error of law. Majority op., ¶ 43. This assertion is an erroneous statement of law, and it sets up a complete red herring, which the majority opinion repeats and repeats and repeats. Majority op., ¶¶ 49, 50, 54, 70, 71. The testimony came in, at least in part, because Shannon did not object to any of the social workers' or Tribal Judge Smart's testimony. It is black letter law that the circuit court does not err by permitting testimony to which no objection was made. *State v. Heredia,* 172 Wis. 2d 479, 482 n.1, 493 N.W.2d 404 (Ct. App. 1992) (concluding that unobjected-to hearsay is admissible for the truth of the matter asserted).

States Constitution. *St. George,* 252 Wis. 2d at ¶ 14 n.8 (citing *United States v. Scheffer,* 523 U.S. 303, 329–30 n.16 (1998) (Stevens, J., dissenting)).

¶ 125. Shannon is a parent in a proceeding to terminate her parental rights, not a criminal defendant subject to prosecution. No Wisconsin case has held that the *Pulizzano* line of cases[4] applies in termination of parental rights proceedings, perhaps because Article I, Section 7 and the Sixth Amendment, upon which *Pulizzano* is based, describe rights for defendants in criminal trials. A termination of parental rights proceeding is a civil proceeding. *See Door County DHFS v. Scott S.,* 230 Wis. 2d 460, 465, 602 N.W.2d 167 (Ct. App. 1999).

¶ 126. The majority opinion raises a whole host of new problems in ruling on evidentiary issues. For example, if the constitutional right to present a defense is now to be applied in a civil context, on what clauses in the state and federal constitutions is it based? Does it apply to plaintiffs in a civil trial, as well as to defendants? Will the circuit court err if it does not consider this right, even though the party who now asserts it did not raise it before the circuit court, as the majority opinion concludes here? The majority opinion does not analyze the rationale of *St. George;* it simply assumes that it applies to this civil proceeding, without a word about why it should be precedent for a civil case. Majority op., ¶ 53 n.25.

¶ 127. However, even assuming, for the sake of discussion, that *St. George* does apply to termination of parental rights proceedings, Shannon does not contend

----

[4] *See, e.g., State v. St. George,* 2002 WI 50, 252 Wis. 2d 499, 643 N.W.2d 777; *State v. Head,* 2002 WI 99, 255 Wis. 2d 194, 648 N.W.2d 413; *State v. Ruszkiewicz,* 2000 WI App 125, 237 Wis. 2d 441, 613 N.W.2d 893.

that her right to present a defense was denied by the circuit court's action. She does not cite to *Pulizzano* or to *St. George,* as supporting a contention that there was a complete bar to her presentation of evidence of a certain type. Instead, she argues by analogy from *State v. Maday,* 179 Wis. 2d 346, 507 N.W.2d 365 (Ct. App. 1993), claiming she was denied a "level playing field" because Tribal Judge Smart and her two social workers testified without objection, while there was a sustained objection to one question she wanted to ask.

¶ 128. *Maday* involved "whether a defendant in a sexual assault prosecution is entitled to a pretrial psychological examination of the victim when the state gives notice that it intends to introduce evidence generated by a psychological examination of the victim by the state's experts." *Maday,* 179 Wis. 2d at 349. In concluding that the trial court did have the discretion to order such discovery, the court of appeals explained:

> Before the trial court may grant such a request, the defendant must have presented evidence of a compelling need or reason for the psychological examination and the trial court must balance the rights of the defendant against the interests of the victim.

*Id.* Therefore, even in a criminal trial, the right to present evidence that supports a defendant's defense is subject to limitation. *See also State v. David J.K.,* 190 Wis. 2d 726, 734, 528 N.W.2d 434 (Ct. App. 1994).

¶ 129. The majority opinion relies mainly on *St. George.* Majority op., ¶¶ 35–37 n.14–17, ¶ 53 n.25, ¶ 68 n.49. *St. George,* in part, involved the exclusion of an expert witness's opinion about the scientific limitations on the use of recantations of prior claims of sexual abuse. *St. George,* 252 Wis. 2d 499, ¶ 35. St. George had argued to the circuit court that the preclusion of his

335

expert's testimony would violate his constitutional right to present a defense. *Id.*, ¶ 38. To consider his contention, in *St. George* we set up a three-step analysis. First, the defendant must offer testimony that is admissible under the evidentiary rules. *Id.*, ¶ 39. In this step, relevancy, Wis. Stat. § 904.01, and assistance to the trier of fact by one qualified to give such opinions, Wis. Stat. § 907.02, must be evaluated. *Id.* If the defendant satisfies those criteria, the defendant must make an offer of proof sufficient to show that the testimony is "necessary" to his or her defense. *Id.*, ¶ 54. If that criterion is satisfied, the defendant must show that the probative value of the testimony is not outweighed by its prejudicial effect. *Id.*

¶ 130. The majority opinion did not analyze Wellens's testimony under the three-step test established in *St. George*, but if it had, it would have concluded that Shannon had not carried her burden. First, as explained above, the circuit court's analysis that Wellens had insufficient knowledge to form the requisite foundation to answer the question posed is reasonable. Second, the excluded question was not necessary to Shannon's case in regard to special verdict question 4 because: (1) the questions that were permitted, as quoted in ¶ 114 above, allowed the jury to make the same inference in deciding on an answer to special verdict question 4, as did the question to which an objection was sustained; (2) Wellens testified that it was his opinion that returning the children to Shannon's custody would not likely result in serious emotional or physical damage to the children; and (3) Shannon testified that she would meet the conditions for the safe return of the children to her home in the following 12–month period. Applying the *St. George* analysis to the proceedings before the circuit court, I

conclude that if Shannon had a constitutional right to present a defense, the circuit court did not deny her that right.

D. The Best Interests of the Child

¶ 131. The legislature has mandated that the judicial branch of government in its interpretation and application of the provisions of ch. 48 shall always consider how its decisions will affect the best of interests of the children to which they are applied. Wis. Stat. § 48.01. In § 48.01(1), the legislature plainly said:

> This chapter may be cited as "The Children's Code." In construing this chapter, the best interests of the child or unborn child shall always be of paramount consideration.

This policy choice was made by those who were elected by the citizens of Wisconsin to establish public policy. In a tri-partite system of government, the courts are not free to ignore policies established by the legislature.

¶ 132. The majority opinion is careful to talk as if it were recognizing the will of the legislature that places the best interest of the child as the highest concern in ch. 48 proceedings. Majority op., ¶ 6. However, those are hollow words that are belied by the lack of any reasoning that explains why Darell's and Daniel's best interests will be served by the possibility of an eventual return to Shannon at some unspecified time, rather than by a permanent home now where each little boy will have a chance to develop to his fullest potential.

III. CONCLUSION

¶ 133. I conclude that the circuit court did not err in its evidentiary ruling, and even if it erred, it was harmless error; that the majority opinion's analysis of

337

the constitutional issue it constructs is flawed; and that the majority opinion ignores the legislature's explicit direction that the best interests of the child are to be paramount in ch. 48 proceedings. Accordingly, I would affirm the court of appeals and I respectfully dissent from the majority opinion.

¶ 134. I am authorized to state that Justices JON P. WILCOX and DAVID T. PROSSER join this dissent.