IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 17, 2010 Session

IN THE MATTER OF KENTAVIOUS M. (d.o.b. 03/29/2007),
A Minor Child Under Eighteen (18) years of age

Direct Appeal from the Chancery Court for Shelby County
No. CH-08-1697-3      Kenny W. Armstrong, Chancellor

No. W2010-00483-COA-R3-PT - Filed December 14, 2010

This is a termination of parental rights case. The trial court terminated the parental rights of the mother on the grounds of persistence of conditions, substantial noncompliance with the terms of the permanency plans, and mental incompetence. The mother appeals, arguing that the Department of Children's Services did not make reasonable efforts to reunite her with the child, the requirements of her permanency plans were not reasonable and related to the conditions that required her child's removal, and the alleged failure to appoint her a guardian ad litem in the prior dependency and neglect proceedings precluded termination of her parental rights for persistence of conditions. Finding no error in the decision of the trial court, we affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
and Remanded

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

William R. Glasgow, Memphis, Tennessee, for the appellant, Kianna M.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Joshua Davis Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

I. Background and Procedural History

This appeal concerns the parental rights of Kianna M. (d.o.b. 1/19/92), a registered

member of the Osage Nation.[1]  Kianna has a lengthy and unfortunate history with the Department of Children's Services ("DCS"), beginning when she was only a toddler and continuing through adulthood.  DCS received numerous reports of abuse and/or neglect concerning Kianna during her early years.  These concerns persisted throughout Kianna's youth, and later reports of truancy resulted in referrals to community service agencies.  The record suggests that Kianna's parents—whom she described as "junkies"—exposed her to domestic violence, subjected her to physical abuse, and failed to protect her from sexual assault.  DCS obtained custody of Kianna in 2004 after her mother was incarcerated on drug charges and her father abandoned her.  She resided with an aunt from October 2005 to April 2007, a period during which she often ran away from home and caused trouble in school.  Eventually, Kianna's aunt determined her niece was too unruly to remain in the home and filed a petition to relinquish custody.

On March 29, 2007, a fifteen-year-old Kianna gave birth to her first child, Kentavious M., who is also a registered member of the Osage Nation.  On April 3, 2007, the juvenile court placed both Kianna and Kentavious in the custody of DCS after conducting a hearing on the petition to relinquish custody.  The next day, DCS filed a petition to adjudicate Kentavious dependent and neglected, and the court entered a protective custody order separately placing the child in the temporary custody of DCS.  DCS initially placed Kianna and Kentavious in the same foster home, with the foster parent assisting Kianna in caring for the child.  Kianna's unruly behavior and running away, however, eventually required DCS to separate her from the child.

On April 19, 2007, DCS developed the first of three permanency plans with respect to Kentavious.  The first plan, which the juvenile court ratified on June 8, 2007, contained the dual goals of exit custody to live with relatives and/or adoption.  The first plan did not contain any desired outcomes related to Kianna but did require her to ensure that Kentavious visited a pediatrician for regular check-ups.  The first plan also required Kianna to ensure that the child received appropriate supervision.  Although the first plan did not require Kianna to address the conditions that led to Kentavious's removal, DCS nonetheless attempted to provide the teen mother with counseling.  Kianna refused to cooperate with the counselor and the sessions were discontinued after she ran away with the child, returning a couple of weeks later.

Upon return, Kianna re-enrolled at the Pyramid Academy, an alternative school that

---

[1]The Osage Nation is an Indian tribe located in Oklahoma.

provides day-care services for teen mothers.[2]  She also resumed counseling and attended
parenting classes.  These services, however, were periodically interrupted by her running
away and unruly behavior.  On August 15, 2007, Kianna ran away from her foster home after
a verbal altercation with her foster mother, which necessitated placing her in a new foster
home.  On October 30, 2007, Kianna ran away with the child after assaulting a caretaker at
the Pyramid Academy.  She returned that same day and was arrested, leading to yet another
placement in a new foster home.[3]  On November 5, 2007, Kianna once more ran away from
school with the child, but she was found that same day.  DCS consequently separated Kianna
from her child and placed the mother in a foster home in Jackson, Tennessee.  On November
21, 2007, Kianna again ran away and did not return until January 14, 2008.

During this period, DCS filed its original petition to terminate Kianna's parental
rights, which it twice amended.  The second amended petition alleged in part that the
conditions necessitating the child's removal persisted and were unlikely to be remedied at
an early date such that continuation of the parent-child relationship would diminish
Kentavious's chances at early integration into a stable and permanent home.  According to
DCS, these conditions included Kianna's frequent running away from DCS placements, her
mental incompetence, and her refusal to complete the tasks of her permanency plans.  DCS
further alleged that Kianna's failure to comply with the responsibilities outlined in her
permanency plans and her mental incompetence were separate grounds for termination.
Finally, DCS alleged that termination was in the best interests of the child, citing the
traumatic impact of a potential change of caretakers and Kianna's inability to care for the
child.  Kianna did not file an answer denying DCS's allegations.

On January 11, 2008, the juvenile court conducted a hearing on the dependency and
neglect petition that DCS previously filed concerning Kentavious.  The court, having
examined the witnesses and considered the evidence, noted Kianna's runaway status and
entered a default judgment in favor of DCS.  The court's order adjudicated Kentavious
dependent and neglected because he was suffering from abuse or neglect, concluding that
Kianna's unruly behavior posed a substantial risk to the child.  Specifically, the court found
that Kianna "would not feed or properly care for said child, would run away with said child,
and would not cooperate with counselors."  The court accordingly placed Kentavious in the
custody of DCS.  Importantly, the court's order also prohibited Kianna and her relatives from
having contact with Kentavious.

---

[2]The record shows that Kianna was expelled from her previous middle school.

[3]Kianna acknowledges in her brief that DCS placed her in at least seven different foster care
arrangements, with the multiple placements arising from her running away and violent behavior.

DCS developed the second permanency plan at a child and family team meeting conducted January 23, 2008. The second plan contained the sole goal of adoption but nevertheless implemented three requirements for Kianna: (1) obtain a mental health assessment and follow its recommendations, (2) enroll in and complete parenting classes, and (3) complete high school or remain in school until the age of seventeen. Kianna initially made progress towards completing the requirements of the second plan. She received a mental health evaluation, re-enrolled at Pyramid Academy, resumed counseling, and attended parenting classes. Again, however, Kianna's running away and unruliness impeded DCS's efforts to provide her the services she needed. She ran away on January 31, 2008, and again on February 29, 2008, returning for the permanency hearing conducted on March 11, 2008. At this permanency hearing, the juvenile court instructed Kianna that any further attempts to run away would result in the termination of her parental rights. Kianna nevertheless proceeded to run away on April 1, April 4, April 7, April 11, July 8, and October 29, 2008. During this period, she assaulted a DCS employee and a security guard, kicked out a window at a level-three foster care facility, and jumped out of a foster parent's moving vehicle. Kianna did not reappear following her last escape from foster care until April 2009.

DCS developed a third permanency plan on January 12, 2009, while Kianna was on runaway status. The third plan maintained the sole goal of adoption and focused its efforts on placing Kentavious with a suitable foster parent. The third plan recognized that the Osage Nation would place the child if the court granted DCS's termination petition, but it also required that DCS provide a stable, suitable home pending adoption. In an order concerning the third plan, the juvenile court stated that Kianna was not a party to the plan. On April 6, 2009, Kianna briefly returned prior to a scheduled termination hearing, which the court continued upon the request of Kianna's counsel. The young mother ran again on April 6, but was later arrested on assault charges and returned to DCS on April 29, 2009. Once again, Kianna ran away on April 29 and returned to DCS only after she suffered serious injuries during a car accident that led to the loss of an unborn child.[4]

The trial court ultimately conducted the termination hearing over two days in October and November 2009. The court concluded that the requirements of the permanency plans were reasonable and related to remedying the conditions that required the child's removal and that DCS proved beyond a reasonable doubt that Kianna was in substantial noncompliance with those requirements. The court further concluded that DCS proved beyond a reasonable doubt that the conditions requiring the child's removal persisted and that Kianna was mentally incompetent to care for the child at that time and in the near future. After determining that termination was in the best interests of Kentavious, the trial court

---

[4]Although drug use was not a major issue during the termination proceedings, the testimony at trial showed that Kianna and the deceased child tested positive for cocaine and marijuana following the accident.

entered an order forever severing Kianna's parental rights. Kianna timely appealed.[5]

## II. Issues Presented

The issues before this Court, as we perceive them, are:

(1)     whether this Court has jurisdiction to review an alleged error in the dependency and neglect proceedings concerning this child;

(2)     whether DCS provided the Osage Nation with sufficient notice of the termination proceedings under the Indian Child Welfare Act;

(3)     whether DCS made reasonable efforts to reunify the mother and child; and

(4)     whether the requirements of the permanency plans were reasonably related to remedying the conditions that required the child's removal.

Kianna does not dispute whether DCS proved beyond a reasonable doubt the ground of substantial noncompliance with the terms of the permanency plans, the ground of persistent conditions, or the ground of mental incompetence. Also, Kianna does not argue that the trial court erred when it determined that termination of her parental rights was in the best interests of the child. These issues are therefore waived. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. App. R. 6(a), (b); *Bean v. Bean*, 40 S.W.3d 52, 55-56 (Tenn. Ct. App. 2000) (citations omitted).

## III. Standard of Review

This Court reviews a trial court's findings of fact *de novo* upon the record, according a presumption of correctness to the findings unless a preponderance of the evidence is to the contrary. Tenn. R. App. P. 13(d)*; In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citation omitted). This Court will not reevaluate the determinations of a trial court based on an assessment of credibility unless clear and convincing evidence is to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005) (citation omitted). This Court reviews the record *de novo* where the trial court has not made a specific finding of fact. *In re Valentine*, 79 S.W.3d at 546 (citation omitted). No presumption of correctness attaches to a trial court's conclusions of law. Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913,

---

[5]The trial court also terminated the parental rights of Joseph D., a putative father, and Unknown Father. No father has appealed.

916 (Tenn. 2000) (citation omitted).

Tennessee Code Annotated section 36-1-113 ordinarily governs the termination of parental rights. The Code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c)(1), (2) (2010). This two-step analysis requires appellate courts to consider "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Although the 'clear and convincing evidence' standard is more exacting than the 'preponderance of the evidence' standard, it does not require the certainty demanded by the 'beyond a reasonable doubt' standard." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007) (citation omitted). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *Id.* (citation omitted).

The Indian Child Welfare Act, 25 U.S.C.A. § 1901 *et seq.* ("ICWA"), imposes an additional requirement in termination proceedings involving an Indian child. It provides:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C.A. § 1912(f) (West 2001).[6] DCS conceded at oral arguments that the "beyond a reasonable doubt" standard applies to all aspects of the trial court's ruling, including the establishment of grounds and the best-interests determination. Because DCS does not argue that the "beyond a reasonable doubt" standard applies only to the specific findings required

---

[6] DCS does not argue that the Existing Indian Family Doctrine should govern the applicability of the ICWA in this case. *See In re K.L.D.R.*, M200800897COAR3PT, 2009 WL 1138130 (Tenn. Ct. App. Apr. 27, 2009); *In re Morgan*, No. 02A01-9608-CH-00206, 1997 WL 716880 (Tenn. Ct. App. Nov. 19, 1997).

under the ICWA, *see, e.g.*, *In re Daniel R.S.*, 706 N.W.2d 269, 319-21 & n.62 (Wis. 2005); *In re Adoption of R.L.A.*, 147 P.3d 306, 310 (Okla. Civ. App. 2006), we will not consider the issue.[7] We will instead analyze the record to determine, where applicable, whether DCS proved beyond a reasonable doubt the requirements for termination of Kianna's parental rights.

## IV. Analysis

### A. Dependency and Neglect

Kianna argues that the prior finding of dependency and neglect concerning Kentavious is void because the juvenile court did not appoint a guardian ad litem to represent her in those proceedings. Tennessee Code Annotated section 37-1-149 provides:

> (a)(1) The court at any stage of a proceeding under this part, on application of a party or on its own motion, shall appoint a guardian ad litem for a child who is a party to the proceeding if such child has no parent, guardian or custodian appearing on such child's behalf or such parent's, guardian's or custodian's interests conflict with the child's or in any other case in which the interests of the child require a guardian. The court, in any proceeding under this part resulting from a report of harm or an investigation report under §§ 37-1-401 – 37-1-411, shall appoint a guardian ad litem for the child who was the subject of the report. A party to the proceeding or the party's employee or representative shall not be appointed.

Tenn. Code Ann. § 37-1-149(a)(1) (2010).[8] Kianna argues that the juvenile court's alleged failure to appoint her a guardian ad litem violated her state and federal due process rights. She accordingly argues that the January 11, 2008 adjudication of dependency and neglect must be set aside. She further argues that if this Court sets the adjudication of dependency and neglect aside, it must also reverse the trial court's finding of persistent conditions.

This argument fails for several reasons. First, we do not have jurisdiction to review error alleged to have arisen during the dependency and neglect proceeding. Subject matter jurisdiction concerns this Court's authority to adjudicate a matter and cannot be waived. *Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 639 (Tenn. 1996) (citing *Landers*

---

[7] Our opinion should not be read as foreclosing this argument in future cases under the ICWA.

[8] DCS argues that Tennessee Code Annotated section 37-1-149(a)(1) does not apply in dependency and neglect proceedings, but the resolution of this appeal does not require us to address this argument.

*v. Jones*, 872 S.W.2d 674, 675 (Tenn. 1994)).  We must consider this issue even if the parties do not raise it.  Tenn. R. App. P. 13(b).  Tennessee Code Annotated section 37-1-159 governs appeals arising out of dependency and neglect proceedings and provides that "any appeal from any final order or judgment in an unruly child proceeding or dependent and neglect proceeding, filed under this chapter, may be made to the circuit court . . . ."  Tenn. Code Ann. § 37-1-159(a) (2010).  "It is clear from the statute that appeals from a juvenile court's final order or judgment in a unruly child or dependency and neglect proceeding are to be made to circuit court."  *In re D.Y.H.*, 226 S.W.3d 327, 329 (Tenn. 2007).  As we have explained:

> In dependent-neglect cases, the parties dissatisfied with a juvenile court's final decision must appeal to the circuit court.  Rather than relying on the juvenile court's record, the circuit court must try the case *de novo* by hearing all the witnesses again and by rendering an independent decision based on the evidence received in the circuit court proceeding.  On the other hand, appeals in termination cases are appealed directly to this court and are governed by the Tennessee Rules of Appellate Procedure.

*In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004) (footnotes omitted).  Only after the circuit court has rendered judgment is an adjudication of dependency and neglect appealable to this Court.  Tenn. Code Ann. § 37-1-159(c), (g); Tenn. R. App. P. 3; *In re D.Y.H.,* 226 S.W.3d at 329 (citations omitted).  Thus, this Court's appellate jurisdiction does not extend to matters on direct appeal from juvenile court in dependency and neglect cases, *see In re D.Y.H.,* 226 S.W.3d at 329-32; *State, Dep't of Children's Servs. v. Owens*, 129 S.W.3d 50, 54-55 (Tenn. 2004), and an attack on the juvenile court's finding of dependency and neglect is not proper in an appeal solely concerning the termination of Kianna's parental rights.

Second, the record does not demonstrate that the juvenile court failed to appoint a guardian ad litem in the dependency and neglect proceedings, even if this issue was properly before us.  Because this is an appeal from the termination of Kianna's parental rights, the record does not contain the majority of papers, transcripts, court orders, et cetera filed in the dependency and neglect proceedings.  This is consistent with Rule 8A of the Tennessee Rules of Appellate Procedure, which provides:

> (c) Content and Preparation of the Record.  In addition to the papers excluded from the record pursuant to Rule 24(a), any portion of a juvenile court file of a child dependency, delinquency or status case that has not been properly admitted into evidence at the termination of parental rights trial shall be excluded from the record.

Tenn. R. App. P. 8A(c).  Assuming arguendo that this issue could have been raised, it was the duty of the appellant to include the materials necessary to support her argument on appeal.  *Marra v. Bank of New York*, 310 S.W.3d 329, 335 (Tenn. Ct. App. 2009) (citations omitted).  The failure to do so requires us to presume that the record wholly supports the trial court's judgment.  *Jones v.*

*LeMoyne-Owen College*, 308 S.W.3d 894, 902 (Tenn. Ct. App. 2009). Without an evidentiary basis to support the argument that the juvenile court failed to appoint Kianna a guardian ad litem, it cannot be sustained.

Additionally, this Court has held that a termination of parental rights should not be reversed for an alleged deprivation of due process during the previous dependency and neglect proceedings if the parent is afforded full procedural protection during the termination proceedings. *In re S.Y.,* 121 S.W.3d 358, 365 (Tenn. Ct. App. 2003) (citation omitted). Kianna has pointed to no procedural infirmities prior to or during the termination hearing, nor has she presented an argument supported by authority demonstrating procedural error. The record shows that Kianna was appointed both an attorney ad litem and a guardian ad litem; she received notice of the termination proceedings through service of process at the home of her foster parent on October 11, 2008; she testified on her own behalf with the benefit and presence of counsel at the November 19, 2009 hearing; and she at all times during the termination proceedings received assistance of counsel.[9] This is sufficient in our view to demonstrate that Kianna received full procedural protection during the termination proceedings. *See id.* We therefore hold that any violation of Kianna's due process rights related to the alleged failure to appoint a guardian ad litem during the dependency and neglect proceedings was remedied by the procedural protections afforded during the termination proceedings. *Id.* at 366. Her argument on this issue is without merit.

### B. *Notice*

The next question before this Court is whether DCS provided the Osage Nation with sufficient notice of the termination proceedings under the ICWA, which provides:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child *shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested,* of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. *No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary*: Provided, That the parent or

---

[9]The record not only demonstrates that a guardian ad litem was appointed to represent Kianna in the termination proceeding, but it also casts doubt on her unsupported assertion regarding the failure to appoint a guardian ad litem in the dependency and neglect proceeding. The record shows that DCS filed a motion for the appointment of an attorney ad litem and guardian ad litem for Kianna. The court soon thereafter appointed Kianna counsel and later continued the case over the objection of DCS to make a "reappointment" of Kianna's guardian ad litem.

Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

25 U.S.C.A. § 1912(a) (West 2001) (emphasis added). Kianna's attorney argued for the first time at oral arguments that the record does not demonstrate that the Osage Nation received notice by registered mail with return receipt requested of the pending termination proceedings.[10]

Generally, this Court will not consider an argument raised for the first time at oral arguments. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. App. R. 6(a), (b); *Ussery v. City of Columbia*, 316 S.W.3d 570, 580 (Tenn. Ct. App. 2009) (citations omitted). The ICWA, however, provides:

Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title.

25 U.S.C.A. § 1914 (West 2001). Courts in other states have taken the position that this statute provides for review of certain violations of the ICWA for the first time on appeal, even if not raised in the trial court. *E.g.*, *In re M.F.*, 206 P.3d 57, 61 (Kan. Ct. App. 2009), *rev'd on other grounds*, 225 P.3d 1177 (Kan. 2010). Additionally, at least one state supreme court has concluded that inadequate notice of termination proceedings divests a trial court of jurisdiction to terminate parental rights; thus, an appellate court must consider the question even if the parties do not raise it. *In re N.A.H.*, 418 N.W.2d 310, 311 (S.D. 1988). The California Court of Appeals, while rejecting the suggestion that failure to properly notify the Indian tribe divests a trial court of jurisdiction, has held that "'[b]ecause the notice requirement [of the ICWA] is intended, in part, to protect the interests of Indian tribes, it cannot be waived by the parents' failure to raise it.'" *In re Antoinette S.*, 129 Cal. Rptr. 2d 15, 21-23 (Cal. Ct. App. 2002) (quoting *In re Marinna J.*, 109 Cal. Rptr. 2d 267, 269 (Cal. Ct. App. 2001)). Without addressing whether sufficient notice under the ICWA is a jurisdictional prerequisite, we conclude that Kianna's failure to raise the notice issue at trial should not preclude consideration of the issue on appeal in light of the potential for collateral attack in a subsequent proceeding. We also find good cause to consider this question despite the absence of an argument supported by authority in the appellant's brief. Tenn. R. App. P. 2; Tenn. Ct. App. R. 1(b).

The purpose of the ICWA's notice requirement is to ensure that Indian tribes receive adequate notice of proceedings concerning Indian children, including in certain cases an opportunity to aid the court's evaluation of the child's Indian heritage. As the Wisconsin Supreme Court has explained:

One of the purposes of the notice requirement is to enable an Indian tribe to

---

[10]Kianna's appellate counsel did not serve as trial counsel and, thus, was not responsible for the failure to raise this issue below.

participate in determining whether the child involved in the proceeding is an "Indian child." *See In re Jeffrey A.*, 103 Cal. App. 4th 1103, 127 Cal. Rptr. 2d 314, 317 (2002). A tribe cannot participate in determining tribal membership unless the tribe is aware of the proceeding. The notice requirement recognizes that Indian tribes have an interest in Indian child welfare proceedings apart from the parties and that the information supplied by the parties regarding the "Indian child" status of the child may be incomplete. *In re M.C.P.*, 153 Vt. 275, 571 A.2d 627, 633 (1989). Thus, the ICWA creates the notice requirement and uses the "reason to know" threshold as the basis for when notice is required.

*In re Arianna R.G.*, 657 N.W.2d 363, 368 (Wisc. 2003) (footnote omitted). Thus, the absence in the record of a return receipt demonstrating strict compliance with the ICWA's notice mandate should not divest a court of jurisdiction or preclude consideration of a termination petition where it is undisputed that the proper Indian tribe received actual notice and participated in the proceedings. *See In re B.J.E.*, 422 N.W.2d 597, 600 (S.D. 1988) (finding actual notice sufficient to satisfy the notice requirement of the ICWA)*; In re T.M.*, 628 N.W.2d 570, 575 (Mich. Ct. App. 2001) (same). This is especially true where the parent did not file an answer denying that DCS provided the Indian tribe with sufficient notice, the parent did not raise the question of notice at any time before the trial court, the Indian tribe did not move to intervene in the proceedings, and DCS did not anticipate having to prove strict compliance with the notice provisions.

The Osage Nation indisputably received actual notice of the termination proceedings in this case. DCS alleged in its second amended petition to terminate Kianna's parental rights:

> 24.　　The Osage Nation Tribe, was contacted, pursuant to applicable provisions of the Indian Child Welfare Act, which they responded, that they did not intend to exercise jurisdiction in this cause until parental rights have been terminated, and that they would facilitate the adoption process and exercise jurisdiction after the outcome of the termination of parental rights hearing.

The petition cites a letter attached as an exhibit to the original petition from Rebecca Fish, Osage Nation Adoption Specialist, stating that the "Osage Nation is very interested in taking custody of Kentavious, once the parental rights for both the mother and the father have been terminated." Kianna did not file an answer disputing this allegation, nor did she raise the issue of notice before the trial court. In addition, the prior orders of the juvenile court, the unrefuted trial testimony, and the permanency plans confirm that the Osage Nation received notice of the proceedings concerning the child and participated in discussions regarding potential placement of the child following the termination proceedings. The juvenile court referee's findings and recommendations concerning the third permanency plan stated, for example, that Rebecca Fish, case manager for the Osage Nation, participated via telephone in a hearing conducted March 17, 2009. There is no evidence, on the other hand, suggesting the Osage Nation did not receive adequate notice of the termination proceedings. The sole inadequacy in the record cited by Kianna's counsel at oral arguments was that the record does not contain a return receipt conclusively demonstrating that the Osage Nation received notice

as described in the ICWA. The absence of said evidence, however, is not controlling under the unique circumstances of this case where the record clearly shows that DCS provided the Osage Nation with actual notice and the Osage Nation communicated with DCS concerning the adoption of the child following termination. We therefore hold that DCS provided sufficient notice to the Osage Nation under the facts. Kianna's argument on this issue is not well-taken.

### C. Reasonable Efforts

Kianna next argues that DCS failed to make reasonable efforts to remedy the conditions that required her child's removal.[11] The decision to pursue a termination of parental rights on the grounds of persistence of conditions and substantial noncompliance generally invokes DCS's statutory duty to make reasonable efforts to facilitate the safe return of a child to the child's home. *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn. Ct. App. 2008) (citing Tenn. Code Ann. § 37-1-166(b), -166(a)(2), -166(g)(2)); *see also In re Tiffany B.*, 228 S.W.3d 148, 151, 160 (Tenn. Ct. App. 2007) (vacating a finding of abandonment, substantial noncompliance, and persistence of conditions for failure to make reasonable efforts).[12] This statutory duty includes an obligation to exercise "'reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family.'" *In re R.L.F.*, 278 S.W.3d at 316 (emphasis omitted) (citing Tenn. Code Ann. § 37-1-166(g)(1)). Courts evaluate the reasonableness of DCS's efforts in consideration of the following factors:

> (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B.*, 228 S.W.3d at 158-59 (footnote omitted) (citing *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)).

The General Assembly nevertheless did not place the burden to reunify parent and child on DCS's shoulders alone. *See State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008) (citation omitted). Reunification "is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the

---

[11]Kianna does not argue that DCS failed to make reasonable efforts to place Kentavious in a timely manner.

[12]DCS does not argue that it was excused from making reasonable efforts to reunify Kianna and Kentavious because the permanency plans did not contain the goal of reunification, nor does it argue that its requirement to make reasonable efforts was limited to placing the child in a timely manner.

parents." *In re Tiffany B.*, 228 S.W.3d at 159 (citations omitted). "Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody." *Id.* "They must also make reasonable efforts to rehabilitate themselves once services have been made available to them." *Id.* (citations omitted).

Kianna points to the mental evaluation she received at the University of Tennessee Center of Excellence, Boling Center for Developmental Disabilities ("Boling Center") as setting the baseline level of treatment DCS was required to provide her under the facts. The treatment team responsible for Kianna's evaluation diagnosed her with a conduct disorder and a depressive disorder. It also assigned her a global functioning assessment of forty. In light of these and other diagnoses, the treatment team made the following recommendations:

> Kianna could benefit from psychotherapy. This has been recommended in the past but has not been successfully implemented due to a variety of factors, primarily that she is on frequent runaway thus avoiding development of any therapeutic relationship. Her running away is the major obstacle to getting treatment. For this reason we recommend placement in a secure residential treatment facility that will have a chance at breaking her cycle of running away. In addition to running away, other disruptive behaviors, impulse control and anger management should be a target of the behavior plan in residential treatment.

> Psychotherapy should be a major component of the treatment program. Cognitive behavioral interventions to address past traumas and losses may allow her to develop coping mechanisms beyond running away. It is anticipated that this therapy will continue following completion of the residential portion of her treatment.

> The residential treatment program should also included [sic] interventions and prevention of substance abuse. She is at very high risk for development of substance abuse problems although she denies current problems in this area.

> Once she is in a stable placement, consideration should be given to medication as part of her treatment. Indications for medications should be evaluated after her placement stability has been established. Antidepressant medications may be of benefit.

> Attention should be provided for her educational success. Due to her extensive absences and periods of non-attendance she may have missed basic concepts despite indications she is intellectually capable. Inclusion in a school group or team may strengthen her chances for successful attendance by appealing to her need for belonging to a group.

> Similarly, inclusion in a pro-social, adult supervised community activity

group might help her feel like she belonged to a group. Identification of an appropriate group will be difficult given her resistance, her lack of stated interests, and her life experiences that are very different from most of her peers.

Recommendations about the custody of her child are beyond the scope of this evaluation but in light of her extensive running away and other maladaptive coping, we can note that her current ability to be an effective parent is lacking. Major gains in multiple areas of her life would be needed prior to development of good parenting skills. Given the pervasive nature of her problems, her prognosis in this area is guarded. The needed maturity may take may months to years to develop depending on the extent of her resistance to change. In the meantime the best interests of the baby (permanency, attachment, nurturance, socialization, etc.) should be actively pursued and not kept "on hold" waiting an uncertain outcome.

Kianna contends that DCS did not prove beyond a reasonable doubt that it made reasonable efforts to reunite her with Kentavious because she did not receive psychiatric treatment in a lock-down facility. She points to the testimony of Dr. Jerry Heston, child psychiatrist at the Boling Center, that Kianna's running away "seemed to be the great limiting step in terms of getting her the help that she needed." Kianna concludes that DCS's failure to provide treatment at a secure residential facility needed to prevent her from running away was unreasonable. DCS responds to the contrary that it made reasonable efforts to assist Kianna. DCS submits that it was unable to place Kianna in a level-four, lock-down facility because she had not been adjudicated delinquent, an assertion it supported with testimony at trial.[13] DCS explains that it placed Kianna in multiple level-three placements, attempted to provide her counseling and individual therapy through Omnivisions, attempted to provide her parenting classes, attempted to ensure that she remained in school, and attempted to provide her with every opportunity to parent her child while in foster care. DCS submits that it indeed provided Kianna many of these services but could not physically restrain her in order to prevent her constant running away. Thus, DCS submits that any failure to exercise reasonable efforts lies with Kianna, who consistently frustrated DCS's attempts to provide services designed to reunite her with the child.

---

[13]The testimony of DCS employees was somewhat inconsistent on this issue. Ocie Duckworth, a supervisor at DCS, testified that the highest level of confinement DCS could provide to Kianna as a dependent and neglected child was a level-two placement, although he initially suggested that DCS placed Kianna in a level-three placement. Mr. Duckworth explained that a level-three placement provides a child in DCS's care with intense counseling, whereas a level-four facility prohibits the child from leaving the facility. Mr. Duckworth testified that Kianna did not receive level-three care because she did not exhibit the certain behaviors that qualify a child for level-three and level-four placements. Ebony Manning, a DCS employee in the foster care department, testified on the other hand that DCS placed Kianna in at least two level-three placements as the case progressed. For example, DCS placed Kianna at Sara's Place, a level-three facility with an on-site therapist, where she escaped by kicking out a window. DCS also placed Kianna in the level-three foster home of Vanessa Thomas, where she escaped after jumping out of the foster parent's moving car. Ms. Manning did not suggest, however, that DCS had authority to place Kianna in a level-four, lock-down facility.

The trial court did not make a finding on reasonable efforts. We must therefore review the issue *de novo*. Having reviewed the record, we conclude that DCS made reasonable efforts to reunify Kianna and Kentavious. Although it might have been preferable to place Kianna in a lock-down facility, the unrebutted testimony was that DCS could not place her in such a facility. This testimony, in addition to the testimony concerning DCS's many attempts to provide services, proves beyond a reasonable doubt that DCS made reasonable efforts throughout these proceedings to reunite the young mother with her child. While Kianna argues that DCS could have "easily" referred Kianna to a secure residential treatment facility, she has provided no legal or factual support for her argument. Further, she has provided no legal or factual support to demonstrate that DCS had a duty to pursue a finding of delinquency, that the facts supported a finding of delinquency, or that DCS could have simply deemed Kianna delinquent. In sum, Kianna failed to demonstrate that DCS legally could have committed her to a lock-down facility.

We hold, in the alternative, that the alleged failure to place Kianna in a lock-down facility is not a basis for reversal on the ground of mental incompetence. As we explained in *State, Dep't of Children's Servs. v. M.R.N.*, No. M2006-01705-COA-R3-PT, 2007 WL 120038 (Tenn. Ct. App. Jan.17, 2007), reasonable efforts generally are not required when terminating on the basis of mental incompetence:

> This Court has held that "the Department's obligation to make reasonable efforts to preserve, repair, or restore a parent-child relationship is not implicated in every termination proceeding." *In re C.M.M.*, 2004 Tenn. App. LEXIS 160, at *28, 2004 WL 438326. "Termination proceedings based on the grounds in Tenn. Code Ann. § 36-1-113(g)(4)-(8) usually will not require the Department to demonstrate that it has made reasonable efforts to reunite a child with his or her parents." *Id*. at *28, n. 26. We note that one of the grounds upon which the trial court relied to terminate Mother's rights in this case, specifically that Mother is mentally incompetent to care for the children, falls within this class of proceedings. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B)(i) (2003).

*M.R.N.*, 2007 WL 120038, at *12; *but see In re Keisheal N.E.*, No. M2009-02527-COA-R3-PT, 2010 WL 2176104, at *8 & n.8 (Tenn. Ct. App. May 28, 2010) (finding that termination on the ground of mental incompetence absent reasonable efforts is permissible only where the proof shows that efforts to address the parent's mental health issues would be in vain). Thus, DCS's failure to place Kianna in a lock-down treatment facility is not cause for reversing the termination of her parental rights, because Kianna has not challenged the trial court's conclusion that she is presently so impaired and is so likely to remain so that it is unlikely she will be able to assume or resume the care of and responsibility for the child in the near future.

### D. Reasonable and Related

Kianna argues as a final matter that this Court should reverse the finding of substantial noncompliance because the terms of her permanency plans were not reasonable and related to

remedying the conditions that required her child's removal. Kianna primarily questions DCS's decision not to place any requirements on her in the initial permanency plan. She has cited no authority, however, to suggest that DCS must include goals and requirements designed to remedy the conditions leading to removal where reunification is not a goal, nor has she offered an argument supported by authority to demonstrate that DCS had a responsibility initially to pursue reunification irrespective of the child's best interests. Additionally, she has not argued that termination on the ground of substantial noncompliance is impermissible where reunification is not a goal of the permanency plans. On the narrow issue raised, we conclude that the second plan prudently required Kianna to obtain a mental health assessment and follow its recommendations, enroll in and complete parenting classes, and continue her high school education. Each of these requirements was reasonable and related to addressing the concerns that required Kentavious's removal in the first instance. Thus, Kianna's argument on this issue is without merit.

### E. Statutory Requirements

As previously noted, Kianna has not presented an argument supported by authority or citations to the record challenging the sufficiency of the evidence supporting grounds for termination. Additionally, she has not challenged the trial court's evaluation of Kentavious's best interests. Although Kianna has waived these issues, we note out of an abundance of caution that the record supports the trial court's conclusion that DCS proved beyond a reasonable doubt the grounds of persistence of conditions, substantial noncompliance with the second permanency plan, and mental incompetence. We further note that the record, including the expert testimony of Dr. Heston, demonstrates beyond a reasonable doubt that continuation of the relationship between Kianna and Kentavious is likely to result in serious emotional or physical damage to the child, which is implicit in the trial court's decision.[14] We therefore affirm the decision of the trial court to terminate Kianna's parental rights.

### V. Conclusion

For the foregoing reasons, the decision of the trial court is affirmed. Costs of this appeal are assessed to the appellant, Kianna M., for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

---

[14] Kianna does not argue on appeal that DCS failed to prove its case with qualified expert witnesses. *See generally In re M.F.*, 225 P.3d 1177 (Kan. 2010) (addressing the expert witness requirement).