COURT OF APPEALS
DECISION
DATED AND FILED

September 16, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos. 2025AP1334**
**2025AP1335**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2023TP5
2023TP42

**IN COURT OF APPEALS**
**DISTRICT I**

APPEAL NO. 2025AP1334

IN RE THE TERMINATION OF PARENTAL RIGHTS TO J.A.M.-S., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

       PETITIONER-RESPONDENT,

  V.

D.J.,

       RESPONDENT-APPELLANT.

**APPEAL NO. 2025AP1335**

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO J.A.G.S.-M., A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

   **PETITIONER-RESPONDENT,**

 **V.**

**D.J.,**

   **RESPONDENT-APPELLANT.**

---

   APPEALS from orders of the circuit court for Milwaukee County: JOSEPH R. WALL, Judge. *Affirmed.*

 ¶1 White, C.J.[1] D.J. appeals the orders terminating her parental rights to her children Jack and Mia.[2] D.J. argues that the circuit court erred (1) in admitting two pretrial psychological evaluations into evidence, as they were privileged under WIS. STAT. § 905.04(2); (2) in allowing the State to introduce evidence at trial that she was on bail for two pending criminal charges in another state; and (3) when it limited the testimony of her former wraparound case worker. For the following reasons, we affirm.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

[2] We refer to the family in this matter by initials or pseudonyms to maintain confidentiality and privacy, in accordance with WIS. STAT. RULE 809.19(1)(g).

**BACKGROUND**

¶2 Jack and Mia are two of D.J.'s children. D.J. gave birth to Jack in 2018, when she was 17 years old, and to Mia in 2020, when she was 19 years old. On January 27, 2023, the State filed a petition to terminate D.J.'s parental rights to Mia, and on March 3, 2023, the State filed a petition to terminate D.J.'s parental rights to Jack. As grounds, both petitions alleged that D.J. had failed to assume parental responsibility for the children, and that the children were in continuing need of protection and services (continuing CHIPS).

¶3 The cases were later joined and proceeded to trial on November 28, 2023. At trial, the State called several witnesses, including D.J. and three case managers who had supervised the children's underlying CHIPS cases. According to the case managers' testimonies, when Jack was born, D.J. was under a CHIPS order herself and had been placed in a group home. D.J. was purportedly placed in out-of-home care, in part, due to her out-of-control, violent, and impulsive behaviors. At the time of Jack's birth, the Division of Milwaukee Child Protective Services (DMCPS) had concerns related to domestic violence between D.J. and Jack's father, as well as concerns related to D.J.'s mental health, anger, and impulsivity. DMCPS had implemented a protective plan at the time of Jack's birth to allow Jack to remain with D.J. at the group home, subject to certain safety conditions.

¶4 Within two weeks of Jack's birth, D.J. allegedly left the group home with Jack for two days without permission, and as a result, DMCPS took custody of Jack and placed him in out-of-home care. On January 8, 2019, the court found Jack to be a child in need of protection and services and set out multiple

conditions which D.J. would have to fulfill in order for Jack to return to her care, including controlling her mental health and providing safe care for Jack.

¶5     D.J. continued to make efforts to comply with the CHIPS conditions: she enrolled in therapy, transitioned from supervised visits to unsupervised overnight visits, and maintained consistent contact with DMCPS. Because of this, the court placed Jack back in D.J.'s care on a trial reunification on November 11, 2019.

¶6     On January 15, 2020, D.J. called her DMCPS case manager and told her that she had brought Jack to the emergency room three days earlier because he had been vomiting and had a fever and that D.J. was now concerned because Jack's fever persisted despite medication. Although the case manager instructed D.J. to take Jack back to the doctor, she did not; she then refused to communicate or cooperate with DMCPS's efforts to check on Jack. The court subsequently granted DMCPS's request to take temporary physical custody of Jack and ultimately revoked the trial reunification. However, D.J. refused to provide her location, and thus DMCPS was unable to take custody of Jack.

¶7     Approximately one year later, in January 2021, DMCPS learned of Jack's location when D.J. took him to a hospital in South Dakota where he tested positive for opiates and was administered Narcan. As a result, D.J. was charged with two misdemeanor offenses and released on bail. A DMCPS case manager traveled to South Dakota and took custody of Jack. DMCPS also took custody of Mia, who was born in August 2020 during the time when DMCPS was unable to locate D.J. D.J. returned to Wisconsin within several days of the incident, but she then missed a court date in South Dakota and her bail was revoked.

¶8      While Jack was still under his original CHIPS order, Mia was found to be a child in need of protection and services on November 24, 2021.  The CHIPS order contained similar conditions for Mia in order to return to D.J.'s care, as were described in Jack's CHIPS order, but with additional conditions, including that D.J. commit no crimes.  This condition specifically required her to follow through with any pending criminal matters, follow all court orders including bail conditions, and to make sure she was available to provide consistent care to her children.

¶9      During the time that Jack and Mia's CHIPS cases were ongoing, D.J. participated in two psychological evaluations.  The first, conducted in 2019 by Dr. Rachel Reinders-Saeman, diagnosed D.J. with ADHD and major depressive disorder.  The second, conducted in 2021 by Dr. Karen Gust-Brey, diagnosed D.J. with ADHD, and gave a provisional diagnosis of narcissistic personality disorder.  Prior to trial, the parties entered a stipulation outlining the diagnoses of ADHD and major depressive disorder only.

¶10     At trial, the State called Melissa Youngs, one of the case managers who worked on the children's CHIPS cases, to testify.  Youngs testified at trial that she did not believe D.J. had fulfilled the conditions of Jack's or Mia's CHIPS orders.

¶11     In her defense, D.J. called Christine Ensch as a witness at trial. Ensch testified that she was a wraparound care coordinator who had worked with D.J. as part of D.J.'s own CHIPS case for around 19 months.  Ensch acknowledged that her professional involvement as D.J.'s wraparound case worker ended when D.J. turned 18, but stated that she continued to be involved in D.J.'s life as "informal support."

¶12 Ultimately, the jury found that both grounds for termination existed as to both Jack and Mia. The circuit court thereafter determined that it was in the children's best interests that D.J.'s parental rights be terminated. D.J. now appeals. Additional facts will be discussed below.

## DISCUSSION

### I. The results of D.J.'s psychological evaluations were not privileged.

¶13 At the final pre-trial hearing, defense counsel objected to the State presenting evidence of the results of D.J.'s psychological evaluations with Drs. Reinders-Seaman and Gust-Brey on the basis that they were not relevant.[3]

¶14 The circuit court ultimately determined that the diagnoses of ADHD and major depressive disorder were relevant, not overly prejudicial, and therefore admissible, and excluded from evidence anything related to the provisional diagnosis of narcissistic personality disorder, finding that the possible prejudice to D.J. outweighed any potential probative value.[4] Based upon this ruling, the parties entered into a stipulation describing the findings and diagnoses of the evaluations, which the court read to the jury.

¶15 D.J. now argues on appeal that the results of the evaluations were privileged and that the circuit court erred in admitting them. D.J. points to WIS.

---

[3] Notably, counsel did not raise the issue of privilege at that time.

[4] At the final pre-trial hearing, the court did briefly point to this court's unpublished decision in *State v. T.M.*, No. 2021AP1729, unpublished slip op. (WI App Aug. 16, 2022) (holding that a parent's psychological evaluation in a TPR proceeding was court-ordered and therefore fell within the exception to privilege under WIS. STAT. § 905.04(4)(b)) as instructive, but it did not give a full analysis as to whether it believed the evaluations were exceptions to privilege.

STAT. § 905.04(2), which provides in part that a patient's confidential communications with their provider are privileged. A communication is considered "confidential" if it is not intended to be disclosed to third persons other than those present to further the interest of the patient. ***State v. Locke***, 177 Wis. 2d 590, 605, 502 N.W.2d 891 (Ct. App. 1993); *see* § 905.04(1)(b) (defining "confidential communication" as one that is not intended to be disclosed to third persons other than those present during the consultation).

¶16     D.J. insists that a patient has the privilege to refuse disclosure of statements made to their treating psychologist at trial, as long as those statements were confidential. Because the psychological reports stated "Confidential Mental Health Record" and "Further Distribution Prohibited Without Consent from … the Client," she argues that she had an objectively reasonable belief that her communications with the psychologists were confidential. While acknowledging that she did sign forms for release of her records, she insists that the only people she authorized to have access to the evaluations were social workers working on the CHIPS cases, who were tasked with helping to provide her with treatment and were therefore part of her treatment team.

¶17     In opposition, the State argues that it is difficult to envision a situation where D.J. had an objectively reasonable expectation that her psychological evaluations would be kept confidential, pointing to the fact that D.J. signed informed consents acknowledging the limits of confidentiality and allowing certain individuals to monitor her progress utilizing the evaluations. The State notes that there is a section on both evaluations entitled "Informed Consent," under which it stated that D.J. "was informed about the nature of the evaluation, as well as the limits of the confidentiality. She appeared to understand this information and was agreeable with proceeding with this evaluation."

7

¶18     The State also points to Jack's CHIPS order, which required D.J. to sign any necessary releases with service providers for her psychological evaluation "to allow the ongoing case manager, the District Attorney's office, and the guardian ad litem or child's attorney to monitor the parent's progress."

¶19     A trial court's decision to admit or exclude evidence is reviewed for an erroneous exercise of discretion. *See* **State v. Hunt**, 2014 WI 102, ¶20, 360 Wis. 2d 576, 851 N.W.2d 434. "A circuit court erroneously exercises its discretion if it applies an improper legal standard or makes a decision not reasonably supported by the facts of record." *Id.* (citation omitted). "Evidentiary privileges interfere with the trial court's search for the truth and must be strictly construed 'consistent with the fundamental tenet that the law has the right to every person's evidence.'" **Locke**, 177 Wis. 2d at 602 (citation omitted). However, the "patient's objectively reasonable perceptions and expectations of the medical provider are the proper gauge of the scope of the [WIS. STAT. § 905.04] privilege." *Id.* at 604 (citation omitted). "The patient's intent to disclose confidential information is crucial in determining whether a valid privilege exists." *Id.* (citation omitted).

¶20     We agree with the State and conclude that D.J. has not shown that she had an objectively reasonable expectation that the results of her psychological evaluations would be kept confidential. D.J. participated in the evaluations as part of her efforts to comply with the CHIPS orders; not as personal, individual therapy sought of her own accord. She also signed informed consents allowing individuals involved in the CHIPS cases to monitor her progress utilizing the contents of the evaluations, and she was informed about the limits of confidentiality. In considering all of these factors, we are not persuaded that D.J. had an objectively reasonable belief that the evaluations would be kept confidential, and thus we

8

determine that they were not privileged. As a result, we find that the circuit court did not err in allowing the results to come in as evidence in a limited manner.

**II. The circuit court did not err when it allowed into evidence limited testimony related to D.J.'s pending criminal matters in South Dakota.**

¶21 Prior to trial, D.J.'s counsel also objected to the State introducing evidence related to the fact that D.J. was on bail and that the bail had been revoked for the two pending charges in South Dakota. The State requested that it be allowed to introduce such evidence. It believed the evidence was relevant to whether D.J. had satisfied the conditions of the CHIPS orders, one of which required that D.J. "Commit No Crimes" and follow up with any bail conditions.

¶22 The circuit court overruled D.J.'s objection, finding that her pending criminal charges and bail were relevant and admissible. However, the court limited such evidence to (1) the facts underlying the criminal charges, (2) the fact that D.J. was criminally charged with two misdemeanors, and (3) the fact that D.J. was not in compliance with her bail conditions and as a result the South Dakota court had issued an order of noncompliance. Based upon this ruling, the parties entered into a stipulation which described D.J.'s pending charges in South Dakota.

¶23 D.J. now argues that the circuit court erred in allowing such evidence to be admitted as it was unfairly prejudicial. Considering the presumption of innocence, D.J. insists that evidence demonstrating she was on bail for two pending criminal charges was unfairly prejudicial, as the charges were unresolved at the time of trial and could have yet been dismissed or she could have been acquitted. D.J. also asserts that the probative value of such evidence was low, given that the State did not present any evidence at trial that the fact that D.J.

had pending criminal charges and was on bail prevented her from assuming parental responsibility or following the CHIPS orders.

¶24 However, the State points out that, under Mia's CHIPS order, D.J. was ordered by the court to "follow through with any pending criminal matters and follow all court orders, including bail/bond conditions." The State argues that the information of D.J. not being in compliance with her bail conditions was extremely relevant. It also points out that the court, in balancing the probative value of the information against the potential prejudice to D.J., carefully reviewed all of the evidence and put limitations on what the State could enter into evidence. For instance, the State was not allowed to specify the names of the offenses with which D.J. was charged, nor was it allowed to state that D.J. had a warrant for her arrest in South Dakota. It was only able to state that there was a court order indicating that she was not in compliance with her bail conditions.

¶25 Again, the decision whether to admit or exclude evidence lies within the discretion of the circuit court. *State v. Quinsanna D.*, 2002 WI App 318, ¶19, 259 Wis. 2d 429, 655 N.W.2d 752. In addition, WIS. STAT. § 904.03 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"

¶26 We agree with the State. Here, the circuit court carefully evaluated whether the probative value of such evidence outweighed its potential prejudice to D.J., finding that "the relevant aspect of it is not substantially outweighed by the prejudicial impact[.]" In further seeking to minimize any potential prejudice to D.J., the court only allowed into evidence that information which it found to be most relevant; the jury was not told which crimes D.J. had been charged with, nor that she had an open warrant for her arrest on those charges. The jury was only

10

able to hear that information which was directly relevant to the issues to be decided, which were whether D.J. had failed to assume parental responsibility for the children and whether D.J. had failed to comply with the CHIPS orders. It was not erroneous for the circuit court to find such evidence to be relevant, given that the fact that D.J. was not in compliance with her bail conditions spoke directly to whether she had fulfilled the conditions of the CHIPS orders. In sum, we are unpersuaded by D.J.'s argument and find that the court did not err when it chose to admit this evidence in a limited manner.

**III. The circuit court did not violate D.J.'s constitutional due process rights when it limited the testimony of Christine Ensch.**

¶27 Prior to trial, the State and GAL sought to limit the testimony of D.J.'s prior wraparound case worker, Christine Ensch. They argued that Ensch was not qualified to testify as to the reasonableness of D.J.'s court-ordered services after she no longer worked in a professional capacity as D.J.'s wraparound case worker, particularly given that she did not have access to all of the confidential information in the case files for Jack and Mia's CHIPS cases. The circuit court ultimately determined that Ensch could only testify about referrals and recommendations she had made when she was D.J.'s wraparound case worker, her factual observations at visits between D.J. and her children, and any statements D.J. had made to her expressing concern about her children.

¶28 D.J. now argues that the circuit court erred in so limiting Ensch's testimony. She asserts that, because of the court's limitations, Ensch was not able to testify about services she recommended, based on her knowledge of D.J.'s needs, to D.J.'s case managers, nor was she able to say why she disagreed with the services DMCPS offered to D.J. pursuant to Jack and Mia's CHIPS orders. Ensch

11

also was not able to offer her opinions on D.J.'s parenting. D.J. asserts that this prevented her from presenting a meaningful defense at trial.

¶29 The State and GAL, however, argue that the circuit court's discretionary determination was the result of a completely reasonable assessment of the facts of the case. They insist that the court's limitations on Ensch's testimony were carefully constructed and did not interfere with D.J.'s ability to present a meaningful defense. The GAL points out that, despite Ensch's professional background, she was not noticed as an expert witness in the case. Further, the State and GAL did not have any records from Ensch from when she was professionally involved with D.J. and they had no way to access such records. Thus, they assert that the court's admissibility determination was appropriate.

¶30 The due process protections of the 14th Amendment apply in termination of parental rights (TPR) cases. ***Brown Cnty. v. Shannon R.***, 2005 WI 160, ¶56, 286 Wis. 2d 278, 706 N.W.2d 269. "A fundamental guarantee of due process of law is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" ***Id.***, ¶64 (citations omitted). The right to be heard "includes the right to 'present a complete defense.'" ***Id.***, ¶65 (citation omitted). Thus, a parent in a TPR case has a due process right to present a defense to the "'fundamental elements' justifying termination." ***Id.***, ¶68 (citation omitted).

¶31 A parent in a TPR proceeding is entitled to present all "relevant" evidence that is not otherwise inadmissible. *See* WIS. STAT. § 904.02. Establishing relevance is a low hurdle, as evidence is "relevant" if it tends to cast any light on the controversy. ***State v. White***, 2004 WI App 78, ¶14, 271 Wis. 2d 742, 680 N.W.2d 362 (citation omitted). Relevant evidence may only be excluded if "its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." WIS. STAT. § 904.03. In addition, "the State has no interest in depriving a parent of the right to be heard when the evidence presented is admissible under the rules of evidence." *Shannon R.*, 286 Wis. 2d 278, ¶67.

¶32 Whether exclusion of particular evidence has denied a person's constitutional right to present a defense is a question of law for this court's de novo review. *See State v. Dodson*, 219 Wis. 2d 65, 69-70, 580 N.W.2d 181 (1998). However, "[t]he constitutional right to be heard is not so broad as to preclude the State from establishing rules of evidence and procedure that impose limits on a party's ability to present evidence, including limits on the testimony of expert witnesses." *Shannon R.*, 286 Wis. 2d 278, ¶65.

¶33 Here, the State was required to prove the grounds of continuing CHIPS by showing that DMCPS made "reasonable efforts" to provide the services ordered by the court. "'Reasonable effort' means an earnest and conscientious effort to take good faith steps to provide those services, taking into consideration the characteristics of the parent or child … the level of cooperation of the parent, … and other relevant circumstances of the case." WIS JI—CHILDREN 324. D.J. thus sought to introduce Ensch's testimony in order to demonstrate to the jury that the State had not made reasonable efforts to provide her with court-ordered services, given that, in Ensch's opinion, the services were not specifically tailored to D.J.'s personality and needs.

¶34 In relation to the failure to assume grounds, the jury was required to look at the "totality of the circumstances" throughout the children's lives to determine whether D.J. had a "substantial parental relationship" with her children.

D.J. thus sought to introduce Ensch's testimony in order to demonstrate to the jury that D.J. was not fully involved in her children's daily care as a result of DMCPS restricting her visitation with her children, which was itself a result of her failing to complete the court-ordered services that were not specifically tailored to her. D.J. argues that she was therefore prevented from presenting evidence central to her defense against the "fundamental elements" justifying termination.

¶35 We are unpersuaded. As noted by the GAL, despite Ensch's professional background, she was not noticed as an expert witness in this case. It would have been inappropriate for her to offer an expert opinion as to whether she believed the services provided by DMCPS were properly tailored to D.J.'s personality and characteristics. This is especially true when considering the fact that Ensch was not professionally involved with D.J. after D.J.'s own CHIPS case ended and Ensch ceased to be assigned as D.J.'s wraparound case worker. This means that Ensch would not have had access to any records indicating which services to which D.J. was referred and would not have been entitled to the specific details which led D.J.'s case management team to make the decisions it did. Ensch would have therefore only been able to provide her lay opinion for any time period following the cessation of her professional relationship with D.J.

¶36 With these considerations in mind, it was entirely reasonable for the circuit court to limit Ensch's testimony in the way that it did. The court recognized the potential relevance of Ensch's professional history with D.J. as well as her personal observations of D.J. after that professional relationship ended. However, the court also clearly recognized that Ensch's testimony, if allowed into evidence unrestricted, could potentially confuse the jury given that Ensch's relationship with D.J. existed in both a professional and personal capacity at different times. The court thus allowed Ensch to serve as a witness for D.J., while

restricting Ensch's testimony in an effort to comply with the rules of evidence and to prevent confusion of the issues. Based on these records, we conclude that the circuit court did not violate D.J.'s constitutional due process rights when it limited Ensch's testimony.

## CONCLUSION

¶37 Based on the foregoing reasons, we conclude that (1) the circuit court did not err in admitting D.J.'s two pretrial psychological evaluations into evidence as the results were not privileged, (2) the circuit court did not err when it allowed limited evidence related to D.J.'s pending criminal matters in South Dakota, and (3) the circuit court did not violate D.J.'s constitutional due process right to present a meaningful defense when it limited the testimony of Ensch.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.